Chester D. Tripp v. Commissioner. Chester D. Tripp, surviving spouse, and Estate of Madeline H. Tripp, deceased, Chester D. Tripp, Executor v. Commissioner.
Tripp v. Commissioner
Docket Nos. 89549, 89550.
United States Tax Court
T.C. Memo 1963-244; 1963 Tax Ct. Memo LEXIS 96; 22 T.C.M. (CCH) 1225; T.C.M. (RIA) 63244; September 11, 1963
William P. Sutter, for the petitioners. Theodore W. Hirsh and Allan B. Muchin, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of the petitioners for the indicated years as follows: Docket
Petitioner
No.
Year
Amount
Chester D. Tripp
89549
1956
$ 465.76
Chester D. Tripp, surviv-
ing spouse, and Estate
of Madeline H. Tripp,
deceased, Chester D.
Tripp, Executor
9550
1955
15,066.00
The issues for determination are the correctness of the respondent's action (1) in disallowing $27,500 of a deduction of $42,500 taken for 1955 for a contribution made by petitioner Chester D. Tripp to the Oriental Institute of the University of Chicago and (2) in disallowing deductions of $531 *97 and $550 taken by petitioner Chester D. Tripp for 1955 and 1956, respectively, as contributions made by him to Luther College. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Chester D. Tripp, sometimes hereinafter referred to as petitioner, and Madeline H. Tripp, deceased, were husband and wife. Madeline H. Tripp died on February 8, 1955, and petitioner was appointed and qualified as executor of her estate. The petitioner filed a joint Federal income tax return, as a surviving spouse and executor of the estate of Madeline H. Tripp, for 1955 and filed an individual income tax return for 1956. Both returns were filed with the district director in Chicago, Illinois. During the years in issue the petitioner was an industrial and consulting engineer with an office in Chicago, Illinois. In addition he was president of a mining corporation, director of another such corporation, and a director of a trust company. He also engaged in several mining ventures in his individual capacity. Prior to and during the years in issue as well as since, the petitioner, as an avocation, has been interested in history, art, and the works of man as shown by *98 excavation and collections around the world. He, individually, has accumulated an important collection of art consisting of articles produced over a period ranging from before the time of Christ to the 18th century. Issue 1. Respondent's Disallowance of a Portion of a Deduction Taken for a Contribution to the Oriental Institute of the University of Chicago Findings of Fact Carl H. Kracling was director of The Oriental Institute, sometimes hereinafter referred to as Oriental, a division of the University of Chicago, Chicago, Illinois, from 1950 to 1960. Prior to such employment, Kraeling had been chairman of the department of Near Eastern languages in the graduate school of Yale University. He also had been in charge of Yale's excavations in Trans-Jordan for several years in the 1930's and its excavations in Syria in the 1940's. Kraeling's duties as director of Oriental entailed directing the research work of a group of scholars, administering Oriental's museum, directing and participating in field excavations, and the acquisition of antiquities for exhibition at Oriental's museum. Such antiquities were acquired by excavation, by purchase with funds supplied by friends of Oriental, *99 by direct gifts, and by loan from potential donors. Antiquities acquired by purchase included Hellenistic-Syrian antiquities, the area of Kraeling's competence. During 1952 Henri Seyrig, director of the French Institute of Archeology in Beirut, Lebanon, brought to the attention of Kraeling five pieces of ancient jewelry, sometimes hereinafter referred to as the Alouf jewelry. The jewelry was owned by Fouad Alouf of Beirut, Lebanon, a merchant and expert in archaeological antiquities, who had been engaged in that business since about 1932. Alouf had purchased the jewelry in 1949 at which time he appraised it at a value of $100,000 and for a time thereafter offered it for sale for that amount. In 1952 Alouf was offering it for sale for $26,000 but thereafter in 1952 or early in January 1953 was offering it for $25,000. In 1952 Kraeling personally examined the Alouf jewelry, which consisted of the following items and which Alouf at that time offered for sale for $26,000: Two gold arm bracelets in the form of snakes; One gold filigree bracelet with inlaid stones; One gold ring with carved stone of male profile; One gold ring with carved stone of two profiles. After examining *100 the jewelry Kraeling concluded that it was a unique collection but that Alouf did not know the value of it. Thereafter, in 1952 or early in January 1953, Kraeling and petitioner were dinner guests at the home of the then president of the Art Institute of Chicago. On that occasion Kraeling told petitioner about the Alouf jewelry and expressed his hope that someone in Chicago might be interested in purchasing it at a then offering price of $25,000. Subsequently and on January 9, 1953, Kraeling sent the petitioner a letter which contained the following: Enclosed herewith are the pictures of the gold treasure in Lebanon. It consists of five pieces: two gold bracelets in snake form; one filigree bracelet, intertwined ivory and grape with inset semi-precious stones, and two rings mounted with black gems of which the one at the right is carved to represent Serapis and Isis and the one at the left Marcus Agrippa, the son of the Emperor Augustus. They belong to a period from which gold ornament is very scarce, namely, the First Century B.C. The workmanship is excellent, the objects are perfectly preserved and are unusually heavy. They are shown in the pictures slightly below actual size. *101 The objects are in the possession of Mr. Fouad Alouf, Place des canons, Im. 1zarieh, P.O. Box 1138, Beirut, Lebanon. In reply to the above-mentioned letter the petitioner on January 12, 1953, sent Kraeling a letter which contains the following: I am returning the photographs of the jewelry that you were good enough to lend me. I hope they get to you in good condition. It seems to me that the price of Twenty-five Thousand is a little fantastic and I will say to you that if a soft spot develops, I would be willing to buy them for Fifteen Thousand with the ultimate objective of giving them to the Institute at some future time. I would assume that in due time we could establish a fair retail value of Twenty-five Thousand which would let me out about even on the deal if it were consummated. I take it from your remarks that this figure is out of line but some development in the east might make it acceptable and I leave it in your hands to work out if you can. After visiting various cities in the area of the Mediterranean Sea, Kraeling arrived in Beirut, Lebanon, on February 5, 1953. On February 6, 1953, he contacted Alouf, reexamined the Alouf jewelry, and discussed with Alouf *102 the matter of purchasing the jewelry on behalf of petitioner. Alouf informed Kraeling that he had paid the equivalent of $15,000 for the jewelry, that he would have to make a slight profit on the sale of it, and that if he was also to pay the export duty on it, he would have to sell it for $20,000. Kraeling replied that the latter amount was too much to pay for the jewelry but that he would contact petitioner. As a result of the discussion Kraeling obtained from Alouf a verbal option as to the jewelry effective until April 1, 1953, and promised to make Alouf an offer by March 15, 1953. Thereupon correspondence between Kraeling and the petitioner ensued in which Kraeling reported on his discussion with Alouf, expressed the view that perhaps the jewelry could be obtained for $18,000 on condition Alouf could be relieved of the export duty thereon, suggested a procedure for such relief, and expressed the view that a valuation of $35,000 for the jewelry for income tax purposes would not be excessive. In the correspondence the petitioner maintained his position that he could not pay in excess of $15,000 for the jewelry. Following the foregoing correspondence Kraeling then in Jerusalem, Jordan, *103 on February 24, 1953, sent Alouf a letter advising him that petitioner had stated that he was unable to pay in excess of $15,000 for the jewelry and stating his (Kraeling's) wish that Alouf reconsider the price of the jewelry. On the same date Kraeling sent Alouf another letter relating to the jewelry which contains the following: May I add a separate word to the letter just written to you in the matter of the gold objects. As you know, I am personally anxious to stimulate men of means to purchase important objects such as your gold collection for the ultimate benefit of my museum at Chicago, and would wish to do anything I could to help along and to pave the way for other acquisitions in the future. While I can do nothing to change the purchase figure set by Mr. Tripp, I might be able to do something on the side that would make the transaction easier and have the following suggestion to make, strictly between us. I should be willing to draw upon my own travel funds to the extent of $1,500 to cover the cost of having the objects brought to America, let us say, if the sale could be effected at the $15,000 figure. To do this I would be willing to leave with Mr. Adib Ishak of Amlevco *104 in Beirut a group of American Express Co. travelers checks signed and countersigned by me. These checks he would be instructed to turn over to you, personally upon receipt of instructions from me after the completion of the sale in New York, a carbon copy of the letter to him to be mailed by me to you on the date of the completion of the transaction in New York. To cover this transaction I should need to receive from Mr. Ishak only a receipt for the sum signed by you, so that I can account for the use of the funds to the Comptroller of the University of Chicago. This supplementary arrangement would be entirely between us and would receive no further mention either to Mr. Tripp or anyone else. To make possible this transaction, I would be drawing my travel account down to the very minimum necessary to assure my own return to the United States, hence the figure I have suggested is the highest I can afford. Hoping to hear from you further in the matter and with kindest personal greetings, I am Despite Kraeling's statements in the foregoing letter to Alouf to the effect that his proposed payment of $1,500 was strictly a matter between him and Alouf and would receive no mention to petitioner *105 or anyone else, Kracling on February 24, 1953, sent petitioner a letter which contains the following: I also wrote a second letter to Mr. Alouf in the matter of a further contribution from me (the Oriental Institute) to the transaction mentioning $1,500 to begin with. This contribution I have specified as being toward the cost of bringing the things to America, rather than to the cost of purchase. There are special reasons for approaching the matter in this way that I will explain to you orally, if I hear more in the matter. During his negotiations with Alouf for the purchase of the jewelry, Kraeling told Alouf that the jewelry was to be given to Oriental. On February 27, 1953, Alouf by letter informed Kraeling that he had decided "to do a sacrifice and give you the advantage to purchase the collection for the amount say 16,500 dollars" and that this decision was taken "just to encourage you" and "pave the way for other acquisitions in the future." Alouf also stated in the letter that a bill of sale would be made out in petitioner's name for the amount of $15,000 and a separate bill would be made out in Kraeling's name; that a regular export permit would be delivered in connection *106 with the transaction; that as a result of his having reduced the selling price of the jewelry, he would attempt to obtain a reduction in the export duty on the jewelry; and that when he saw Kraeling on a later stated date, they together would execute all the formalities connected with the transaction. Upon being informed by Kraeling that he had arranged for the purchase of the Alouf jewelry for $15,000, the petitioner, with his personal check dated March 23, 1953, purchased from the Continental Illinois National Bank and Trust Company of Chicago a cashier's check dated March 23, 1953, for $15,000 made payable to Alouf. On March 24, 1953, Alouf issued an invoice to the petitioner for the Alouf jewelry showing the price thereof as $15,000 and containing the certification of Pere Nicolas Karam and Fouad Alouf that the five pieces of jewelry "are old and genuine Greco-Roman antiques." On or about April 27, 1953, the Alouf jewelry was delivered to Elsie D. Kraeling, wife of Kraeling, at the airport in Beirut, Lebanon, following issuance by customs officials of an export permit. At that time the above-mentioned cashier's check for $15,000 purchased by petitioner was delivered to Alouf. *107 The export permit was issued on the basis of a payment of an export duty of 20 percent of the invoice price of the jewelry, $15,000. A higher price would have resulted in the payment of a higher export duty. In connection with the sale of the jewelry to petitioner, Kraeling paid Alouf $1,500 as a matter of dividing or sharing with Alouf the amount of the export tax or duty. Such payment was in accordance with the practice of Oriental of contributing to the expense of transferring objects to its museum for the purpose of exhibition. Immediately following delivery of the jewelry to her, Kraeling's wife returned to the United States by airplane and brought the jewelry with her. Upon its arrival in the United States the jewelry was sent to Oriental. At all times since it has been in the custody and possession of and on display at Oriental. The records of the Port of Chicago Customs House disclose the following with respect to the Alouf jewelry: Importer of Record, Director of Oriental Institute; From Fouad Alouf, Beirut, Lebanon; Port of Lading, Beirut, Lebanon; to Karl H. Kraeling, Director, Oriental Institute; Estimated Value, $16,500. For the trip from Beirut, Lebanon, to the *108 United States the jewelry was insured for a value of $16,500 and on May 13, 1953, the petitioner made a donation to Oriental of $150 for the premium on the insurance. Thinking that he had not formerly so advised Kraeling, the petitioner on May 18, 1953, advised Kraeling by letter that he intended for the Alouf jewelry to remain on loan to Oriental, at least for the time being, and therefore suggested that a receipt be sent him for the jewelry and that proper insurance thereon be maintained by Oriental. Subsequently and on or about June 5, 1953, Oriental caused an insurance policy expiring June 5, 1955, to be taken out on the jewelry in which the respective items of jewelry were insured in the following amounts: Two gold arm bracelets in the form of
snakes at $3,500 each
$ 7,000
One gold filigree bracelet with inlaid
stones
4,000
One gold ring with carved stone of male
profile
2,000
One gold ring with carved stone of two
profiles
2,000
Total
$15,000
Thereafter and about June 3, 1955, Oriental caused a new insurance policy to be taken out on the jewelry in which the respective items of the jewelry were insured in the amounts shown immediately above and *109 all totaling $15,000. The policy taken out on June 3, 1955, was cancelled on June 3, 1956, and from that date to the time of the trial herein the jewelry was insured under a general policy of insurance covering all of the fine arts owned by Oriental. The Alouf jewelry was the subject of an article, "Hellenistic Gold Jewelry In Chicago," in Archaeology, a magazine, written by Kraeling and published in the fall of 1955. The article was not written at the suggestion of petitioner but was written as a normal procedure to inform the scholarly world of the existence of the jewelry at Oriental's museum. Publication of the article made no difference in the value of the jewelry to a dealer in that type of jewelry. The carved stone of a male profle mounted in one of the gold rings of the Alouf jewelry bears carved on its outer flat surface the Greek legend "Menophilos made." "Menophilos" is a Greek name and the Greeks did not always inscribe their names on gems carved by them. Only about 12 to 15 gems are known to bear the inscription of the names of the persons who carved them. On December 16, 1955, the petitioner donated the Alouf jewelry to Oriental, expressing his hope that it would *110 enrich Oriental's "already wonderful collection." Prior to the donation and during the time the jewelry was on loan to Oriental it was exhibited with a label identifying the petitioner as owner. Following the donation of the jewelry it was exhibited with a label identifying it as a gift from petitioner. In his joint income tax return for 1955 the petitioner deducted $42,500 as a contribution on account of his donation of the Alouf jewelry to Oriental in that year. In determining the deficiency in issue for 1955 the respondent allowed $15,000 of the deduction and disallowed the remainder of $27,500 as representing an overstatement of the value of the jewelry. Opinion The tax-exempt status of Oriental Institute has been stipulated and is not in issue. Taking the position that he has established that the Alouf jewelry had a fair market value of at least $50,000 at the time he donated it to Oriental on December 16, 1955, the petitioner contends that the respondent not only erred in disallowing $27,500 of the deduction of $42,500 taken by him on account of his donation of the jewelry but also erred in failing to increase the amount of the deduction by $7,500. The respondent takes *111 the position that the record fails to show that he erred in failing to allow a deduction in excess of $15,000 on account of the petitioner's donation of the jewelry to Oriental. In support of a fair market value of $50,000 for the jewelry the petitioner relies on the opinion testimony of Alouf, Kraeling, and Fahim Fouchakji, an art dealer and collector engaged in handling antiquities at least since about 1925. Alouf's testimony is contained in a deposition taken in January 1962 and stipulated in evidence by the parties. The parties also stipulated that Alouf is to be regarded as a witness appearing on behalf of the petitioners. The deposition shows that at the time of purchasing the Alouf jewelry in 1949, Alouf appraised it at a value of $100,000 and that in a letter dated May 16, 1955, to petitioner, Alouf stated that its value "could be estimated easily at 50,000 dollars." In the deposition Alouf expressed the opinion that the fair market value of the jewelry in December 1955 was $100,000, subject to normal times, but admitted that he had no knowledge of any sales at or about December 1955 of antiquities comparable to the jewelry. Alouf expressed the further opinion that the *112 fair market value of the jewelry in 1961 was $100,000. Despite the fact that in his letter dated February 27, 1953, to Kraeling, he stated that he had decided to sell the jewelry to petitioner "just to encourage you" and "pave the way for other acquisitions in the future," Alouf stated in his depositon that his only reason for selling the jewelry was that he was in need of money. Prior to the sale of the jewelry Alouf never had sold any jewelry or other antiquities to the petitioner and his subsequent sales to petitioner have consisted only of a few common pieces of little value. In our opinion a fair and reasonable conclusion to be drawn from the record relating to the sale of the Alouf jewelry is that after having offered it for sale for a period of 4 years during which time he was unable to obtain a greater price, Alouf, in an arm's length transaction, sold it for payments totaling $16,500 and in connection with which he paid an export duty of 20 percent of $15,000, or $3,000, leaving him a net amount of $13,500 or $1,500 less than his stated cost of the jewelry and $86,500 less than the amount at which he appraised it at or about the time he purchased it. The record does not *113 contain anything to indicate that the sale was a forced sale or to support the implication that Alouf's financial condition at the time of the sale was such as to require a sacrifice of $86,500 or any other amount in the value of the jewelry. Since the $1,500 paid by Kraeling was for the purpose of sharing with Alouf a portion of the export duty, we think the transaction is to be regarded as a sale of the jewelry to petitioner for $15,000. In our view Alouf's appraisal of the value of the jewelry at the time of purchase in 1949 and his subsequent experience in the sale of it, together with his valuation of it at $100,000 in December 1955, demonstrate his willingness to attribute an extravagantly fanciful value to it. Kraeling testified at the trial herein that in his opinion the jewelry had a fair market value in December 1955 of between $42,000 and $50,000, which he stated more definitely as about $47,000. When asked for an explanation of the difference between the selling price of $15,000 for the jewelry in 1953 and a value of $47,000 in 1955, Kraeling stated that "I know a bargain when I see one"; that the jewelry had been purchased at a bargain price; and that it had been acquired *114 without having passed through the hands of dealers in Geneva and New York which would have increased its value. On February 6, 1953, when Alouf told Kraeling that the jewelry had cost him the equivalent of $15,000 and that he would have to sell it for $20,000 in order to pay the export duty and make a slight profit on it, Kraeling replied that that amount was too much to pay for the jewerly. However, on the same day, Kraeling wrote petitioner that he thought the jewelry could be purchased for $18,000 if Alouf could be relieved of the export duty thereon and that a valuation of $35,000 for it for income tax purposes would not be excessive. If an amount of $20,000, out of which an export duty of 20 percent or $4,000 was payable, was too much to pay for the jewelry in 1953, we are unable to understand how the acquisition of the jewelry for $18,000 out of which Alouf would not pay an export duty would give the jewelry a valuation of $35,000 for income tax purposes. The fact that antiquities pass through the hands of dealers does not always result in an increase in their cost or fair market value to a purchaser or purchasers. There is evidence to the effect that when dealers buy antiquities *115 and thereafter before selling them decide to purchase other antiquities, they as a rule reduce the prices at which they are offering for sale the antiquities then owned by them in order to dispose of them before purchasing the antiquities they have decided to purchase. In the instant case, Alouf, a merchant and expert in archaeological antiquities since 1932, in 1949 purchased the jewelry in issue herein at a stated cost of the equivalent of $15,000 and, after offering it for sale for 4 years, sold it, realizing a net amount therefor of $13,500. Fouchakji testified at the trial. He expressed the opinion that petitioner purchased the jewelry at a bargain price; that the jewelry after its arrival in the United States had a fair market value of between $40,000 and $50,000 in each of the years 1953, 1955, 1958, and 1963; that if he had purchased the jewelry in 1953 for $15,000, he, as a dealer, would have offered it for sale for more than $40,000; and that if it had been offered to him in 1955 for $40,000, he probably would have paid that amount for it. Fouchakji further testified that, although he first had examined the jewelry a few days before the trial, he had been informed from *116 Lebanon of its existence during the time it was owned by Alouf and that the latter was offering it for sale but that he made no attempt to purchase it from Alouf because he did not think it was exportable from Lebanon and he did not "want to have any smuggled goods." Apparently he was not sufficiently interested in the jewelry to make inquiry as to its exportability from Lebanon. Except for the implication contained in the statement of Fouchakji, there is nothing in the record to indicate that the jewelry ever at any time has been the subject of smuggling. In addition to the values of the jewelry testified to by the above-named witnesses, the petitioner testified to the opinion that the jewelry had a value of $42,500 when he donated it to Oriental in 1955 and that he considered such to be a low value. Where sales of the property to be valued have been made at or about a crucial date, they are preferred as evidence of value rather than opinion. Andrews v. Commissioner, 38 F. 2d 55 (C.A. 2, 1930), affirming 13 B.T.A. 651 (1928); John J. Flynn, 35 B.T.A. 1064 (1937). *117 The only sales of the Alouf jewelry as to which evidence has been submitted were the sale of it to Alouf in 1949 at a price equivalent to $15,000 and the sale of it by Alouf to the petitioner in 1953 which resulted in a net amount received for it by Alouf of $13,500. In December 1955, or approximately 2 years and 8 months after petitioner acquired it, he donated it to Oriental. To find, as the petitioner contends, that the jewelry had a fair market value of $50,000 in December 1955 would require us to conclude that during that period of 2 years and 8 months some situation arose, or some development occurred, or both, which requires such a conclusion. Since, as heretofore indicated, we have concluded that Alouf's sale of the jewelry to the petitioner constituted an arm's length transaction, we are unable to conclude that petitioner acquired the jewelry at a bargain price. Fouchakji's testimony to the effect that the jewelry had the same value in each of the years 1953, 1955, 1958, and 1963 negatives the occurrence of any development during the above-mentioned period of 2 years and 8 months which would cause an increase in its value during that period. After having carefully examined *118 the evidence of record bearing on the question, including the reasons stated by the witnesses for the valuations as of December 1955 testified to by them, we are unable to find that the jewelry in petitioner's hands had any greater value in December 1955 than the amount he paid therefor in 1953, namely, $15,000. Accordingly we hold that no greater amount than that was deductible by him on account of his donation of the jewelry to Oriental in that year. The respondent is sustained as to this issue. Issue 2. Respondent's Disallowance of Deductions Taken for Contributions to Luther College Findings of Fact Sometime prior to August 23, 1954, the petitioner met Robert F. Roble, a young boy who lived in Door County, Wisconsin and who thereafter on one occasion did some work at petitioner's summer home in that county. Through a friend of Robert the petitioner learned that Robert had a brilliant high school record, that he was desirous of going to college to study for the ministry, and that he would be unable to do so without some assistance. The petitioner inquired of Robert about his desires and learned that he desired to attend Luther College, Decorah, Iowa. The petitioner was impressed *119 with him, informed him that for a number of years he had helped deserving boys and girls to obtain a college education, and indicated to him that he (petitioner) would give him some financial aid in obtaining a college education. Theretofore the petitioner never had made any donation or contribution to Luther College nor even had heard of it. Subsequently and on August 23, 1954, the petitioner sent to the director of admissions of Luther College a letter, the petitioner's first letter to Luther College, containing the following: I am interested in the work that your College is doing and I am enclosing my check for $225.00, which as I understand it, represents tuition for one term, plus book requirements. Of late, I have been interested in the career of Mr. Robert F. Roble, who is a very promising young man in my opinion, and whose family lives close to my Summer Home. I believe he deserves all the help he can get toward his education. I am aware that a donation to a Scholarship Fund is only deductable [deductible] if it is unspecified, however, if in your opinion and that of the authorities, it could be applied to the advantage of Mr. Robert F. Roble, I think it would be *120 constructive. In reply to the foregoing letter of petitioner, and on the following day, August 24, 1954, the director of admissions of Luther College sent petitioner a letter containing the following: We are in receipt of your check for $225.00 which has been placed in the Student Account to the credit of Robert F. Roble. We are enclosing a receipt for same. The amount has been credited to the account of Robert Roble, and you may inform him of this if you so desire. Thus, it should now be possible for you to list this as deductible. We certainly appreciate your interest in Robert, and we look forward to having him with us as a student at Luther. Thereafter, on the indicated dates, letters were addressed to Luther College by petitioner or in his behalf by his secretary containing the following: February 8, 1955 We enclose herewith Mr. Tripp's check in the sum of $296.00, payable to Luther College, as a Scholarship Grant for Robert Frederick Roble, in accordance with your statement submitted dated January 18, 1955. Student Registration No. 1448 * * *
October 4, 1955 Enclosed please find Mr. Tripp's check No. 15536 in the amount of $235.00, payable to Luther College *121 covering statement rendered as Student Registration No. 3168 in the name of Robert Frederick Roble. It is our understanding that this payment for tuition and other miscellaneous expenses, constitutes a scholarship for Mr. Roble. * * *
January 19, 1956 Enclosed please find check in the amount of $235.00, payable to your order, as a Scholarship Grant for Robert Frederick Roble, in accordance with your statement submitted on January 17, 1956. Student Registration No. 3833 On September 26, 1956, the petitioner's secretary in behalf of petitioner addressed to Robert at Luther College, Decorah, Iowa, a letter containing the following: In Mr. Tripp's absence from the office he has asked me to write you, and to thank you for your nice letter of September 17th. Enclosed herewith find Mr. Tripp's check in the sum of $315.00 covering statement known as Student Registration No. 6004. In Mr. Tripp's behalf I extend to you his best wishes for your success, as well as your brother, in this school year. Accompanying the foregoing letters of February 8, 1955, October 4, 1955, and January 19, 1956, were checks of petitioner payable to Luther College in the amounts stated in the *122 respective letters. Accompanying the letter of September 26, 1956, was a check of the petitioner payable to an undisclosed payee in the amount stated in the letter. Robert was the ultimate recipient of the amounts of the checks accompanying the foregoing four letters. The petitioner did not at any time have any agreement with Luther College to make payments to it for any definite length of time. In his joint income tax return for 1955 the petitioner deducted as a contribution made during that year to Luther College an amount of $531, representing the total amount of the checks accompanying the letters of February 8, 1955, and October 4, 1955, and in his income tax return for 1956 deducted as a contribution made during that year to the college an amount of $550, representing the total amount of checks accompanying the letters of January 19, 1956, and September 26, 1956. In determining the deficiencies in controversy the respondent disallowed the deductions taken by petitioner in his return for the respective years on the ground that the amounts thereof represented donations made "for the *123 benefit of a named individual" Robert, and were not deductible under section 170 of the Internal Revenue Code of 1954. Opinion The tax-exempt status of Luther College has been stipulated and is not in issue. The parties also have stipulated that Robert was the ultimate recipient of the amounts of the checks accompanying the four letters written in 1955 and 1956 set out in our findings. The controversy between the parties is whether the amounts of the checks represented contributions made for the benefit of one designated individual, Robert, rather than contributions to Luther College for an indefinite number of persons. The petitioner takes the position that the evidence is clear that the amounts in controversy constituted contributions made by him to Luther College and were not in fact or in law contributions to Robert. In support of his position the petitioner contends on brief that in essence what transpired was, in summary, as follows: The petitioner made an initial contribution to the college, suggesting that it consider Robert as a scholarship recipient. That while the college may have felt some moral obligation to award a scholarship to Robert *124 if he were worthy, it was under no legal obligation to do so. The college did, in fact, make Robert a scholarship recipient and thereafter he was entitled to receive his tuition and miscellaneous expenses as a scholarship student. Although petitioner was under no obligation to contribute toward such expenses, the college each semester sent petitioner a statement showing the amount of such expenses, and each semester the petitioner contributed an equivalent amount to the college. The sums so sent to the college might have been spent by it for another student and Robert might have received his funds from the general scholarship funds of the college. The petitioner further states that if he had chosen not to contribute in any given period, he had no obligation to do so; that, on the other hand, the college was under no obligation to make Robert a scholarship recipient but, having done so, it was obligated to pay him the amount of the scholarship and it solicited the petitioner as a source of funds and that such solicitation was solely the decision of the college and not part of any contractual arrangement between the college and the petitioner. The difficulty with the petitioner's summarization *125 is that it contains statements and conclusions which are not supported by the record. The import of the petitioner's letter of August 23, 1954, to the director of admissions of Luther College was not that he was donating $225 to the scholarship fund or funds of the college but was that he thought application of the amount of $225 to the advantage of Robert would be a "constructive" application of it and that he so desired that such application be made. In accordance with such import, the $225 was credited to the account of Robert on the books of the college and the director of admissions of the college so informed the petitioner by letter on August 24, 1954. Such letter in nowise indicated or purported that by entering such credit on its books, the college thereby awarded Robert a scholarship. Nor de we find anything in the record to indicate that the college ever at any time thereafter awarded Robert a scholarship or took any other action obligating it to provide Robert with tuition, book requirements, or miscellaneous requirements out of its scholarship funds, or any of its other funds, irrespective of whether the petitioner provided funds therefor. In petitioner's letters of February 8, 1955, October 4, 1955, and *126 January 19, 1956, addressed to Luther College and transmitting checks of petitioner payable to the college, as well as the letter of September 26, 1956, addressed to Robert transmitting a check of petitioner drawn to an undisclosed payee, the amounts of the checks are shown as earmarked for the benefit of Robert and show his student registration number at the college for clarity and for facility in crediting him with the amounts of the checks. From our consideration of all the evidence bearing on the question we are of the opinion that rather than being gifts to the college for the benefit of an indefinite number of persons, the amounts of the petitioner's checks issued during the years 1955 and 1956 were intended to be and were for the sole benefit of one specified person, Robert. S. E. Thomason, 2 T.C. 441 (1943), involved the deductibility as contributions of amounts paid for the benefit of, and to provide special advantages for, a designated ward of a charitable organization. In holding that such amounts were not deductible as contributions, it was said: Charity begins *127 where certainty in beneficiaries ends, for it is the uncertainty of the objects and not the mode of relieving them which forms the essential element of charity. Russell v. Allen, 107 U.S. 163. The Supreme Court, in speaking of charitable trusts, said in that case: * * * They may, and indeed must, be for the benefit of an indefinite number of persons; for if all the beneficiaries are personally designated, the trust lacks the essential element of indefiniteness, which is one characteristic of a legal charity. * * * Whenever the beneficiary is designated by name and his merit alone is to be considered, the bequest is private and not public and ceases to have the peculiar merit of a charity. Bullard v. Chandler, 21 N.E. 951; I.T. 3549, C.B. 1942-1, p. 79. * * * In our opinion what was said in the Thomason case is applicable here and accordingly we sustain the respondent's disallowance of the deductions involved herein. Cf. DeJong v. Commissioner, 309 F. 2d 373 (C.A. 9, 1962), affirming 36 T.C. 896 (1961); Cooper v. Commissioner, 264 F. 2d 889 (C.A. 4, 1959), affirming a Memorandum Opinion of this Court. *128 Decisions will be entered for the respondent.