ROBERT C. CHIU AND CAROL A. CHIU, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14166–83.     Filed April 15, 1985.

*Ronald W. Gabriel* and *Charles M. Steines*, for the petitioners.

*Nancy Herbert* and *Robert J. Kastl*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1978 | $20,508.17 |
| 1979 | 46,429.93 |
| 1980 | 36,550.00 |

In dispute is the value of certain gemstones and mineral specimens donated by petitioners to the Smithsonian Institution.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation is incorporated herein by this reference. Petitioners were residents of Columbus, Ohio, at the time they filed their petition

herein. They filed joint Federal income tax returns for the taxable years 1978, 1979, and 1980 with the Cincinnati Service Center, Covington, Kentucky.

## Items in Dispute

On or about October 3, 1977, petitioners acquired a group of 10 gemstones from Pala Properties International, Inc. (Pala), of Fallbrook, California, at a cost of $11,000. This group included one 36.40-carat sinhalite acquired at a cost of $2,912. On or about October 15, 1977, petitioners acquired one 75-carat cat's-eye rubellite tourmaline from Gemarvi Pedras Preciosas Ltd., Governador (Gemarvi) of Valaderes, Brazil, at a cost of $7,500. On or about December 21, 1978, petitioners donated the sinhalite and the tourmaline to the Smithsonian Institution (the Smithsonian). On their tax return for 1978, petitioners claimed a deduction of $15,470 for contribution of the sinhalite and $35,625 for contribution of the tourmaline.

On or about April 22, 1978, petitioners acquired from Charles Key of Sarasota, Florida, a 239-carat topaz at a cost of $5,975. On or about July 30, 1978, they acquired from Gemarvi one 7.66-carat euclase at a cost of $3,500. On or about August 24, 1979, they donated to the Smithsonian the topaz, the euclase, the nine other gemstones acquired from Pala in October 1977 at a total cost of $8,088, and one 7.10-carat cerussite, the seller, date of acquisition, and cost of which are unknown.

On or about November 19, 1978, petitioners acquired from Charles Key one 373.29-carat lithium niobate for $4,479. On or about December 27, 1979, they donated the lithium niobate to the Smithsonian.

On their tax return for 1979, petitioners claimed charitable deductions of $35,850 for the topaz, $19,150 for the euclase, $39,619 for the group of nine gemstones, $532 for the cerussite, and $24,263.85 for the lithium niobate.

On or about July 11, 1979, petitioners acquired one 18.29 carat euclase from International Lapidaries of Boynton Beach, Florida, at a cost of $15,000. On or about August 4, 1979, petitioners acquired 27 mineral specimens from Mineral Kingdom of Woodmere, Long Island, New York, at a cost of $5,000. On or about November 5, 1980, petitioners donated the euclase and the 27 mineral specimens to the Smithsonian. On

their tax return for 1980, petitioners claimed a deduction of $64,015 for the euclase and $28,775 for the 27 mineral specimens.

In the statutory notice of deficiency, respondent disallowed petitioners' claimed deductions in excess of $10,750 for 1978, $26,555 for 1979, and $20,000 for 1980.

Petitioners never purchased any insurance with respect to any of the gemstones or mineral specimens contributed by them to the Smithsonian in 1978, 1979, or 1980. They had never sold any gemstones or minerals. Petitioner Robert C. Chiu is by occupation a physician, and petitioners have no demonstrated experience in dealing in gems or minerals.

The prices for gemstones and mineral specimens remained stable during the years in issue, and there was no significant appreciation in value of the items donated by petitioners to the Smithsonian between the times of acquisition and the times of donation.

Although some of the smaller items in issue potentially could be sold to jewelers to be set in jewelry, the most likely ultimate consumer for most of the items was an individual collector or a museum.

The amounts claimed by petitioners on their tax returns were based on appraisals obtained by petitioners. Most of the appraisals were obtained from William W. Pinch (Pinch) at or about the time that the items were acquired. On or about May 15, 1984, in preparation for trial of this case, Pinch reappraised most of the items that had been contributed to the Smithsonian by petitioners during the years in issue. The reappraisal was requested to take account of the Court's opinion in *Anselmo v. Commissioner*, 80 T.C. 872 (1983). Set forth in the Appendix is a chart showing the amounts determined by Pinch's reappraisal and the values attributed by other experts testifying at trial, as set forth below.

### *William W. Pinch*

Pinch is a collector of mineral specimens and the owner and curator of the Pinch Mineralogical Museum, which contains approximately 16,000 mineral specimens. He has been engaged in the field since 1947 and is sufficiently knowledgeable to be regarded as an expert in mineralogy. He is not, however, formally trained in gemology or appraisal techniques.

From 1979 through the time of trial, Pinch was employed by Investment Rarities to buy gemstones and train employees who would be selling gemstones over the telephone. Investment Rarities sold gemstones to the public for a standard markup of 25 percent.

Pinch's reports comprising his May 1984 appraisals were prepared by petitioners' counsel from the appraisal reports attached to petitioners' tax returns. Language drafted by counsel and defining fair market value was added. Pinch nonetheless signed the appraisals. In several instances his testimony at trial in July 1984 differed from certificates of appraisal signed by him and dated May 15, 1984. For example, his 1979 appraisal of the 3.00 carat jeremejevite (acquired as a part of the nine gemstones purchased in October 1977 at a cost of $8,088) described the item as "probably the world record," and valued it at $6,000. His May 1984 report repeated that statement and value, although, according to Pinch, "that shouldn't be on there. It is not the world record." A similar incident occurred with respect to the 18.29 carat euclase acquired in July 1979. Another item was appraised as an "exceedingly large" epidote. Although Pinch was advised prior to trial that this item was not an epidote, he did not change his report prior to testifying that "this is obviously an error on my part * * * the stone is a tourmaline, either a uvite or a dravite. I have not examined it since [1979]." Other items described by Pinch as without flaws or "clean" were shown to have visible inclusions. His appraisal reports were replete with superlatives such as "exceedingly" large or rare, "superb" and "flawless," that were not justified upon an item-by-item examination by the various experts at trial.

Pinch's appraisals for the most part were not based on any actual sales of comparable items. In many instances, he relied on reported offering prices without verifying whether those prices had ever in fact been paid for such items. Some of his valuations were based on information from William Larson, the owner of Pala. His appraisals did not take into account the cost of the items appraised, even those acquired from Pala at about the same time as his original appraisal. In valuing the 75.00 carat cat's-eye rubellite tourmaline acquired in October 1977, Pinch ignored the purchase price of $7,500. His appraisal report valued the stone as of December 1978 at $28,125 while

stating: "It is a bit difficult to place a value on a gem when there are no records of similar size and quality stones ever being sold." Although his reports identified alternative ultimate consumers for the items appraised, he did not determine alternative values.

### Paul Desautels

Paul Desautels (Desautels) was curator of the Gem and Minerals Collection at the Smithsonian for 25 years, including the time that the items in issue here were donated. He left the Smithsonian in 1982. At the time of trial, he was employed as a consultant to an individual collector of mineral specimens. He is knowledgeable and qualified as an expert in gems and minerals. He received no formal training, however, in gemology or in appraisal of gemstones or mineral specimens, and he does not have extensive experience in the purchase or sale of gems or minerals.

Desautels did not generally place values on items at the time they were donated to the Smithsonian. Although he expressed an opinion of the value of some mineral specimens in issue at the time of trial of this case, many of those specimens were not in the same condition as they had been at the time of the donation because they had been damaged after the time of donation. His valuation at the time of trial was therefore based on his recollection of the condition of the items from 2 to 5 years earlier. Desautels had no explanation for the damage to the mineral specimens that took place after the donation to the Smithsonian because valuable items were set apart in a special room to be handled only by special persons.

Desautels' estimates of the values of the items donated to the Smithsonian were based on his observation of the range of offering prices for specimens and his opinion of the relative quality of the particular specimen. The range of prices for some varieties was as great as from $30 to $200 a carat for blue topaz; $100 to $10,000 for wulfenite crystals; $100 to $7,000 for anglesite crystals; and $100 to "several thousands" dollars for cerussite crystals. He described the prices as "all over the map" and the market for collector items as "chaotic * * * completely chaotic." He could not state a value for the sinhalite contributed to the Smithsonian by petitioners in 1978 because:

There's no way to establish a price structure. There are no stones of considerable size. There's no way to establish that kind of market.

The price in this case as in most cases of very exotic gemstones is what the market will bear. That means, the dealer has to know, has to have a stable of customers, has to know what they'll stand for. And as he normally does, he leans hard, gets one competing against the other and gets the highest price he can get.

His opinion that the leadhillite specimen donated to the Smithsonian by petitioners in 1980 had a value of $1,000 was qualified as follows:

Each specimen is unique. Every mineral specimen is unique. And a matter of judging—it's a true free market what the seller will let it go for, and what the buyer will pay for it. And the only way that you can establish what the market is is what the availability of the material is, how will you go for it, and that's the price.

Desautels could not recount specific sales transactions in the items he valued because:

Business in exotic gems, really fine top quality exotic gems and in fine mineral specimens is a very secretive business. Dealers don't tell you and there's no way to know—you can't ever see invoices and you can't see money change hands. It's done—you know they're sold because you know where they were and you know where they went.

In purchasing gemstones, Desautels had never been able to get a discount greater than 30 percent from the asking price, even at a time when the dealer was under pressure to sell. The normal discount by a dealer under pressure is 10 percent from the asking price.

Among the five persons considered by Desautels to be among the most "prominent" in the field of gemstones were William Larson of Pala and Pinch. Desautels had a longstanding relationship with Pinch, for whom he wrote letters of recommendation in 1981 and 1982.[1]

### Cosmo Altobelli

Cosmo Altobelli (Altobelli), one of respondent's experts, is a jeweler and appraiser. He has been in the business of appraising since 1948. Also beginning in 1948, Altobelli became

---

[1] The letters themselves were not received in evidence. The testimony that Desautels wrote such letters for Pinch was not objected to and may be considered.

involved in mineral specimens and compiled a personal collection in excess of 100 specimens. He has been a Graduate Gemologist since 1969, having completed a 6-month residency course consisting of classes given 5 days a week for 8 hours each day by the Gemological Institute of America (GIA). The course included training in the use of full instrumentation and instruction on gemstones generally encountered in the jewelry industry, as well as stones typically found in museums or acquired by collectors. In 1970, Altobelli received a degree as a Certified Gemologist, which requires the title of Graduate Gemologist and an additional course in retailing. He is also a Certified Gemologist Appraiser, a title conferred by the American Gem Society upon completion of an examination. Altobelli developed an examination used by the American Gem Society for certification of Certified Gemologist Appraisers. He authored a book on jewelry appraisal guidelines and is a member of various professional organizations and of the Appraisal and Ethics Committee of the American Gem Trade Association. At the time of trial, Altobelli had been retained by GIA to appraise its entire collection of over 15,000 pieces of gemstones, cut stones, mineral specimens, organic materials, carvings, and rough materials. He is experienced in the purchase and sale of mineral specimens. He did not independently test the items at issue herein to determine their identity before preparing his report as to their value.

### Elly Rosen

Elly Rosen (Rosen), respondent's other expert, is a gemological appraisal consultant and a Graduate Gemologist of GIA. The latter title was earned by completion of proficiency examinations and a 2-year course of instruction on diamonds, colored stones, and gem identification. He is a senior member of the American Society of Appraisers, certified in gems and jewelry upon completion of an examination on appraisal ethics, appraisal theory, and gems and jewelry. He teaches courses in the appraisal of gems and jewelry, including appraisal ethics, research techniques, identification and authentication procedures, terminology, and report writing. He is a member of various other professional societies. During the years in issue, he performed in excess of 100 appraisals encompassing approximately 1,000 items.

## ULTIMATE FINDINGS OF FACT

Each of the experts testifying on behalf of the parties was experienced in identifying and categorizing the items about which he testified and had some experience qualifying him to testify in the form of an opinion as to the value of those items. Because of the sporadic nature of the gem and mineral markets and the uniqueness of many of the items in question, however, their opinions as to the value of most items were based on very little, if any, information of actual sales of comparable items.

Petitioners' experts, Pinch and Desautels, had little experience and essentially no training in appraisal techniques. Pinch's opinions as to value were based upon superficial examination of the items on which he expressed an opinion, contained numerous errors, and did not accurately reflect fair market value. Desautels' opinions did not accurately reflect fair market value.

Respondent's experts, Altobelli and Rosen, performed careful and systematic examinations of the items, using recognizable standards of appraisal attributable to their training and background. Their experience in dealing with collectibles, however, was limited; and they necessarily relied on researching reported transactions rather than on personal knowledge.

The value of the items donated by petitioners to the Smithsonian Institution in 1978, 1979, and 1980 was the same as the cost of those items acquired by petitioners in 1977, 1978, and 1979. There is no reason to believe that petitioners received a discount from the price that would have been paid by the ultimate consumer of the items in transactions between a willing and knowledgeable buyer and a willing and knowledgeable seller, neither being under compulsion to buy or sell.

The value of the 7.10 carat cerussite, the cost and date of acquisition of which is unknown, was $284 on the date of donation, August 24, 1979. (As appears from the Appendix, this amount is the value determined by Altobelli.)

## OPINION

There is no dispute in this case that an actual donation was made to a qualified charitable donee under section 170(c).[2] To determine the allowable deduction, however, we must determine the fair market value of the donated property, to wit, "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A–1(c)(2), Income Tax Regs. The parties differ—and as shown in the Appendix, the differences are great—as to the value of the items donated.

The testimony of Pinch, of course, might not be expected to be free of bias because he had provided most of the appraisals on which the deductions in issue in this case were based. The editing of his reports by counsel and numerous uncorrected errors, as described in the findings of fact, cast serious doubt on the reliability of his opinions. We conclude that this is a case where "Petitioners' expert witness so exaggerated his estimates of the value of * * * [the property] that his testimony was incredible, i.e., not credible." *Dean v. Commissioner*, 83 T.C. 56, 75 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 99 (1984).

It would be hard to deny that Desautels is, by experience, an expert in identifying and categorizing gems and minerals and qualified to give an opinion as to the relative quality and rarity of particular specimens. His background and experience in appraising items, however, is not so impressive. He testified that only a small number of the items in the Smithsonian gem and mineral collection were acquired by purchase and that much of the gem and mineral industry depended on physical trading of gems. His general testimony as to the basis of his opinions, set forth in the findings of fact, would support the conclusion that any opinion is far too subjective to be reliable evidence of the value of a particular item without regard to an actual sale of that item. Desautels described the gem and mineral markets as "chaotic." He described prices in terms of "whatever the seller can get." In determining his own opinion of the value of any item, he disregarded any appraisals by any other persons. He specifically did not take into account the

---

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

cost of the items to petitioners or the appraisals by Pinch of the items donated to the Smithsonian in this case. Desautels' criteria cannot be equated with the recognized and applicable definition of fair market value.

We find it particularly astonishing that neither Desautels nor Pinch took into account the prior sales of the same items to petitioners, even though the seller of some items, Larson of Pala, was identified by each of them (and by Altobelli) as a person on whom they relied in reaching their opinions. There is no credible explanation of how petitioners, with no demonstrated training or experience, were able to acquire numerous items at 75 to 90 percent discounts from value when Desautels could at most obtain a discount of 30 percent from a seller under pressure, and the usual discount was 10 percent. Pinch was involved in selling gemstones over the telephone at markups of only 25 percent.[3] The evidence negated any inference that market conditions would explain an increase in value between the date of purchase and the date of donation. Petitioners did not testify, and, from their failure to do so, we infer that their testimony would not have been helpful to them.[4] See *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners' counsel sought unsuccessfully to elicit an explanation from Pinch as follows:

Q. First of all, let me ask you one preparatory question. Do you think that appreciation in a one-year period of time is the basis for the increase in value or the difference in value between what was paid and what you appraised any stone at?

A. No, things don't just increase in value like that generally.

Q. The prices have been fairly stable for all the items we have been discussing.

A. You know, they're fairly stable within a certain percentage, 20 percent.

Q. All right. Would you go ahead and explain to the Court based on your experience in dealing—not dealing but trading and buying stones and exchanging stones and your conversations with others in the field, why do you think this could have occurred or did occur?

---

[3] In the related case of *Talebi v. Commissioner*, T.C. Memo. 1985–180, in which the parties stipulated that the qualifications portion of Pinch's testimony in this case would be incorporated, Pinch testified that the maximum discount obtainable for gemstones would be 50 percent.

[4] This case was originally set for trial May 7, 1984, in Columbus, Ohio, but was continued at the request of petitioners because of the unavailability of Pinch. The place of trial was changed to Washington, D.C., but petitioners were given the opportunity to testify in Columbus, Ohio.

A. It's quite possible at any gem and mineral show if you know what you're doing to walk in and buy something at one side of the show and in some cases, go over to the other side of the show and turn around and sell it for three to five times, sometimes even 10 times as much as you paid for it.

\* \* \* \* \* \* \*

A. There are cases where dealers are selling things that they do not know what they are. \* \* \*

\* \* \* \* \* \* \*

A. There are some cases when dealers may even know what they have there, and they just aren't quite aware of what the top dollar they could get for the material is.

There are cases where they've had material faceted from rough, and they're concerned only about the cost that they have in it. And they haven't researched the market. There are rare gems occasionally that get sold for way less than they should be sold for.

I think most anyone that's been into the collectibles market know this can happen with antiques or it can happen with a lot of things.

\* \* \* \* \* \* \*

A. Yes, I don't think, in many of these cases, that the stones increased at all. I think that that was the value, the dollar's value on the stones probably when they were bought.

I don't know the exact date that they were bought or the exact price that was paid. In the minerals I know what was paid.

Q. One final point, Mr. Pinch. I'm sure it's crossed everybody's mind in this case that it's—must be extreme good fortune on the part of the Doctor to pick up so many different gemstones and mineral specimens, and for whatever reason acquire stones at 25 percent of their value as appraised by you. Could you shed any light on that at all?

Ms. HERBERT: Your Honor, I object. It has not been shown that this witness has personal knowledge of Dr. Chiu's purchases or that he was present at the time of purchase or knows where the items were, in fact, purchased.

THE COURT: The objection is sustained.

BY MR. STEINES:

Q. Mr. Pinch, are you familiar with the circumstances in which Dr. Chiu acquired his stones?

A. Which—

Q. Gemstones—excuse me, his mineral specimens?

A. Yes, the mineral specimens.

Q. Were you present when that occurred?

A. Yes.

Q. Did you offer any advice to him?

A. He came to me for advice. He had selected—he had a group of things selected, and he came to me to ask me about the value of the material that he had selected.

And he asked me to talk to the person that was selling them and see if I could get some more things thrown in and argue—help him argue the price, which I did. .

Q. And at the time that Dr. Chiu had selected his initial groupings of stones, had he done a pretty good job, in your opinion, of obtaining choice specimens for a—what you would consider to be a very good price?

A. I thought it was a very nice selection.

The speculation as to why one might occasionally buy an item at less than "top dollar" is strikingly unrelated to what actually happened in this case and, in any event, is not relevant to determination of *fair market value.* Notwithstanding the insertion of definitions of fair market value into Pinch's reports by petitioners' counsel, we have serious doubts as to Pinch's understanding of or conformity to that standard.

Both Pinch and Desautels testified that the difference between the opinions of petitioners' experts and the opinions of respondent's experts was the failure of respondent's experts to recognize that the collector market depended more on the rarity and world-record size of particular items than on specific qualities of the specimens. Once Pinch's errors were corrected, there was little difference between the experts' opinions as to the specific qualities of the items in issue; but they differed as to the significance of those qualities. Petitioners' experts did not dispute the qualifications of respondent's experts as gemologists or the care with which respondent's experts approached their task.

Petitioners attempted to impeach the opinion of respondent's expert Altobelli by asking him to identify, without any preparation, instruments, or research material, certain mineral specimens. Those specimens were from the collection of Pinch and were not among the items that Altobelli had previously been asked to examine. Altobelli was unable to identify accurately one of the specimens. We were not impressed by this exercise, however, because Altobelli's opinion as to the items in issue assumed that the items had been correctly described by the Smithsonian. Pinch, by contrast, made a mistake in identifying a gemstone that he had specifically appraised twice, because, by his own admission, he failed to carefully examine the item even after a possible

mislabeling had been called to his attention by personnel of the Smithsonian.

Nonetheless, we conclude that there is merit to petitioners' attempt to distinguish between appraisal of gemstones for use in jewelry and valuation of specimens for collector purposes. Although Altobelli and Rosen expressed opinions of the value of items in the collector market, their experience in dealing with collectibles was limited. That does not mean, however, that we must accept the opinions of petitioners' experts when those opinions cannot be tested against adequate evidence of comparable sales or other objective standards and, for the reasons stated above, are not persuasive.

Although opinion evidence is obviously admissible and relevant on the question of value, we must weigh such evidence in light of the demonstrated qualifications of the expert and all other evidence of value. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. *Barry v. United States*, 501 F.2d 578 (6th Cir. 1974); *Kreis' Estate v. Commissioner*, 227 F.2d 753, 755 (6th Cir. 1955); *Tripp v. Commissioner*, 337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938); *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court.

Because of the excess of advocacy, or "overzealous effort" of petitioners' experts here, we might merely adopt the opinion of respondent's more reasonable expert. See *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 451–452 (1980). Or we might merely conclude that petitioners have failed to satisfy their burden of proof. See *Anselmo v. Commissioner*, 80 T.C. 872, 885–886 (1983). In this case, however, we have what has been described as the most reliable evidence of value, to wit, sales of the same property within a short period of time prior to the valuation date. In another context, the Court of Appeals for the Sixth Circuit, the court to which our decision in this case is appealable, has recently stated that "In determining the fair market value of property, little evidence could be more probative than the direct sale of the property in

question." *Estate of Kaplin v. Commissioner*, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. a Memorandum Opinion of this Court. In a case involving facts similar to those before us here, but where respondent did not produce expert testimony contradicting that of petitioners, the Court of Appeals in *Tripp v. Commissioner, supra,* explained:

The petitioner contends that inasmuch as the respondent offered no expert testimony the testimony of petitioner's expert witnesses should have been heeded and their opinions accepted by the Tax Court as determinative of the December 1955 value of the jewelry and that it was clearly erroneous for that court to reject their valuations. But the record discloses that the opinion testimony of these witnesses was almost wholly subjective in character. And, opinion evidence which does not appear to be based upon disclosed facts is of little or no value. Balaban & Katz Corp. v. Commissioner, 7 Cir., 30 F.2d 807, 808. Petitioner's witnesses failed to support their conclusions as to value with facts of convincing probative value. The Tax Court was not, under the circumstances, obliged to accept as sound the opinion of the taxpayer's experts. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Dayton P. & L. Co. v. Public Utilities Commission, 292 U.S. 290, 299, 54 S.Ct. 647, 78 L.Ed. 1267. In the absence of any convincing reason forming a basis for the opinions expressed we are of the view that the Tax Court was fully justified in concluding that the cost of the jewelry to the petitioner in 1953 was the best evidence of its fair market value in December of 1955, the date of the gift. Cost, here, was cogent evidence of value. Cf. Guggenheim v. Rasquin, 312 U.S. 254, 258, 61 S.Ct. 507, 85 L.Ed. 813; Gessell v. Commissioner, 7 Cir., 41 F.2d 20, 22. There is no substantial evidence that any situation arose or development occurred in the interim which increased the value of the collection. * * *

In view of the unsatisfactory nature of the expert opinion testimony and its lack of a realistic basis in fact we see no ground for upsetting the fair market value finding of the Tax Court as clearly erroneous. It is based on facts definitely established—the price a collector of such objects paid a dealer-expert on the advice of another expert who was anxious that the purchaser make the acquisition; and the valuation used for insurance purposes during the pre-gift period.

[*Tripp v. Commissioner*, 337 F.2d at 434–435.][5]

Although petitioners did make a bulk purchase of some of the gems and mineral specimens in question here, and the donated items must be valued on an individual basis (*Anselmo*

---

[5]In our Memorandum Opinion, we stated:

"Where sales of property to be valued have been made at or about a crucial date, they are preferred as evidence of value rather than opinion. *Andrews v. Commissioner*, 38 F.2d 55 (C.A. 2, 1930), affirming 13 B.T.A. 651 (1928); *John J. Flynn.* 35 B.T.A. 1064 (1937). [*Tripp v. Commissioner*, T.C. Memo. 1963–244, 22 T.C.M. 1225, at 1231, 32 P-H Memo T.C. par. 63,244, at 63–1398.]"

*v. Commissioner*, 80 T.C. at 883–884), the individual values attributed by the more credible experts do not in total vary significantly from the bulk price paid.

There is no credible evidence that petitioners' acquisitions were at prices not reflecting the appropriate market, and, in any event, petitioners' experts did not vary their opinions based on alternative markets. On the basis of the entire record, we conclude that the fair market value of the donated property on the date of donation was the cost of the property to petitioners.

In concluding that the cost of the property is the best evidence of fair market value, we are, of course, also considering the other evidence in the record and the absence of evidence that would otherwise be relevant. Although petitioners did not testify, their failure to take steps to secure, insure, or prevent damage to the property is in evidence. Although no current employee of the Smithsonian testified, evidence in the record suggests that the donee did not take steps to secure, protect from damage, display, or otherwise make use of the property. The use to which donated property is put (or, by implication, the failure to put property into use) is relevant. See *Skripak v. Commissioner*, 84 T.C. 285, 322–323 (1985); *Cupler v. Commissioner*, 64 T.C. 946, 955 (1975).[6] These factors reinforce our rejection of the inflated values claimed by petitioners.

Because the amounts allowed in the notice of deficiency were not less than cost, and respondent has not sought an increased deficiency

*Decision will be entered for the respondent.*

---

[6]In *Skripak v. Commissioner*, 84 T.C. 285 (1985), the Court found that the fair market value of the donated property was approximately 60 percent of what petitioners had paid slightly more than 6 months before. Because, in this case, respondent's experts testified that the fair market value of some items was less than petitioners' cost, such a finding would not be out of the question here, if we were inclined to rely on the expert testimony. See *Price v. Commissioner*, T.C. Memo. 1985–182.

## APPENDIX

### DONATIONS ON OR ABOUT DEC. 24, 1978

Experts' Values[1] as of Donation Date

| | Item | E. Rosen | C. Altobelli | W. Pinch |
|---|---|---|---|---|
| 1. | One tourmaline, 75 carats | $3,001.20 | $7,500.00 (5,252.10) | $28,125 |
| 2. | One sinhalite, 36.40 carats | 2,914.40 | 4,500.00 | 12,740 |
| | Totals | 5,915.60 | 12,000.00 9,752.10 | 40,865 |

### DONATIONS ON OR ABOUT AUG. 24, 1979

| | Item | E. Rosen | C. Altobelli | W. Pinch |
|---|---|---|---|---|
| 1. | One euclase, 7.66 carats | $3,264.00 | $2,298 | $15,320 |
| 2. | One rhodochrosite, 21.32 carats | 3,198.00 | 1,279 | 4,264 |
| 3. | One elbaite variety rubellite, 37.83 carats | 2,649.50 (5,034.05) | 5,675 | 9,457 |
| 4. | One jeremejevite, 3 carats | 450.00 | 750 | 6,000 |
| 5. | One cassiterite, 12.6 carats | 631.50 | 1,260 | 2,520 |
| 6. | One apophyllite, 9.27 carats | 278.10 | 278 | 927 |
| 7. | One apatite, 30.98 carats | 930.30 | 1,239 | ·3,098 |
| 8. | One sphene, 27.76 carats | 416.55 | 694 | 2,766 |
| 9. | One chrome kornerupine, 1.02 carats | 130.00 | 127 | 510 |
| 10. | One 10.7 carat stone "epidote tourmaline" | 107.00 | 428 (Approx. $214) | 2,140 |
| 11. | One cerussite, 7.10 carats | 106.50 | 284 | 355 |
| 12. | One topaz, 239 carats | 3,728.40 (5,736.00) | 5,975 | 23,900 |
| 13. | One lithium niobate, 373.29 carats | 4,200.00 | 5,600 | 13,065 |
| | Totals | 20,089.85 (24,482.00) | 25,673 | 84,322 |

## APPENDIX

### DONATIONS ON OR ABOUT NOV. 5, 1980

*Gemstone*

| | | | | |
|---|---|---|---|---|
| 1. | One euclase, 18.29 carats | $10,980 | $5,487 | $36,580 |
| | Subtotal | 10,980 | 5,487 | 36,580 |

*Mineral specimens*

| | | | |
|---|---|---|---|
| 2. | One leadhillite | 125 | [2]500 |
| 3. | One malachite on calcite | 100 | 200 |
| 4. | One smithsonite (pale yellow) | 100 | 350 |
| 5. | One mimetite on dolomite | 50 | 75 |
| 6. | One cuprian dolomite with pyrolusite | 100 | 150 |
| 7. | One wulfenite | 70 | 100 |
| 8. | One copper on calcite | 65 | 75 |
| 9. | One willemite on smithsonite | 50 | 100 |
| 10. | One cerussite with copper inclusions | 75 | 100 |
| 11. | One anglesite (yellow) | 85 | 175 |
| 12. | One azurite | Stone not available | 2,000 |
| 13. | One wulfenite (blue) on matrix | 100 | 100 |
| 14. | One smithsonite on tenantite | 150 | 450 |
| 15. | One dioptase | 350 (400) | 2,500 |
| 16. | One willemite (blue) | 100 | 300 |
| 17. | One rhodochrosite | 400 (450) | 2,500 |
| 18. | One smithsonite (yellow) | 200 | 750 |
| 19. | One smithsonite (pink) | 250 | 2,000 |
| 20. | One smithsonite (hugh group) | 400 (500) | 2,000 |
| 21. | One malachite psuedomorph after azurite | 500 | 2,000 |

APPENDIX

| | | | |
|---|---|---|---|
| 22. | One mimetite on cerussite on mottramite | | $500 | $1,750 |
| 23. | One wulfenite | | 125 | 500 |
| 24. | One anglesite | | 300 | 3,500 |
| 25. | One calcite | | 400 | 1,000 |
| 26. | One cuprite with copper and malachite after calcite | | 200 | 600 |
| 27. | One cerussite | | 300 | 3,000 |
| 28. | One smithsonite | | 125 | 175 |
| | | | 5,220 | |
| | Subtotal— mineral specimens | N/A | (5,420) | 26,950 |
| | Subtotal— gem specimens | $10,980 | 15,487 | 36,580 |
| | | | 10,707 | |
| | Total for 1980 | 10,980 | (10,907) | 63,530 |

[1]Secondary or alternate values given by experts, whether due to alternate market or claimed damage, indicated in parentheses.
[2]Desautels testified that in his opinion the value was $1,000. Otherwise the opinions stated by Desautels approximated those of Pinch.