FRANKLIN P. PERDUE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Perdue v. Commissioner
Docket No. 29710-89
United States Tax Court
T.C. Memo 1991-478; 1991 Tax Ct. Memo LEXIS 527; 62 T.C.M. (CCH) 845; T.C.M. (RIA) 91478; September 26, 1991, Filed *527 Decision will be entered under Rule 155. Johannes R. Krahmer and John S. McDaniel, for the petitioner. Ruth M. Spadaro, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION The principal issues in this case are the valuation of a charitable contribution made by petitioner, and whether petitioner is liable for several related additions to tax as well as additional interest. Respondent determined a deficiency for 1984 in the amount of $ 18,267, additions to tax for negligence under section 6653(a)(1) in the amount of $ 913 and section 6653(a)(2) in the amount of 50 percent of the interest on $ 18,267 and for valuation overstatement under section 6659 in the amount of $ 5,480, and additional interest under section 6621(c) in the amount of 120 percent of the interest on $ 18,267. Petitioner donated a gold disc, a gold chain, and a gold coin recovered from a Spanish galleon sunk in 1622 to the National Museum of American History, which is part of the Smithsonian Institution. After concessions, the issues for decision are: 1. The fair market value of the three artifacts. Both parties relied on expert testimony. We conclude that the total *528 fair market value of the three artifacts on December 28, 1984, was $ 311,000, compared to $ 374,814 claimed by petitioner and $ 74,000 determined by respondent. 2. Whether petitioner is liable for additions to tax for negligence under section 6653(a)(1) and (a)(2) and for valuation overstatement under section 6659, and for additional interest for a substantial underpayment related to a tax-motivated transaction under section 6621(c). We hold he is not. Unless otherwise specified, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year at issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Franklin P. Perdue, resided in Salisbury, Maryland, when he filed the petition in this case. Petitioner is in the integrated poultry producing business, and he is chairman of the board of Perdue, Incorporated. 1. The Sinking and Rediscovery of the Atocha
a. The Sinking
The Spanish galleon, the Nuestra Senora de Atocha (the Atocha) was one of a 28-ship Spanish fleet (the Tierre Del Firme fleet) that sailed from Havana, *529 Cuba, on September 4, 1622, bound for Cadiz, Spain. The Atocha carried a cargo of gold and silver coins, gold and silver bullion, indigo and other items. It also carried passengers and sailed heavily armed. On September 5 to 6, 1622, the ships of the Tierre Del Firme fleet sailed into a hurricane, and 8 of the 28 ships in the fleet, including the Atocha, sank. The Atocha sank approximately nine nautical miles west of Marquesas Key and approximately 40 nautical miles west of Key West, Florida. In late September 1622, Spanish salvors attempted to salvage the Atocha. However, the ship lay in water too deep to be salvaged effectively with the equipment available. Only two cannons were recovered at that time. A second hurricane struck on October 5, 1622. As a result, salvors were unable to relocate the Atocha, despite searches that continued for many years. b. Rediscovery of the Atocha and Certain Artifacts
The wreck of the Atocha was located by a Treasure Salvors, Inc. (TSI), salvage crew on June 12, 1971. Prior to this date, Dr. Eugene Lyon, then a graduate student of history and a consultant to TSI, performed extensive research in Spanish archives containing records *530 of Spanish treasure shipments from the New World in an attempt to find the site of the Atocha. He discovered Spanish salvage accounts placing the wreck near the Marquesas Key. Plans were implemented to locate, identify, map, and catalog the wreck of the Atocha and each artifact therefrom in a scientific and archeological method. On June 12, 1971, TSI divers recovered an anchor of the type carried by galleons of the Tierre del Firme fleet near the Marquesas Key. Thereafter, the divers recovered moderate quantities of muskets, cannon balls, barrel hoops, ballast stones, a few gold chains and gold bars and a brass astrolabe (an early navigational instrument) in working condition. On July 4, 1973, TSI personnel positively identified the wreck as that of the Atocha. On that date, TSI divers recovered silver bars bearing serial numbers corresponding to those of silver bars listed in the Atocha manifest in the Spanish archives. After the positive identification of the Atocha wreck in 1973 and before July 1985, TSI divers recovered various artifacts from the wreck, including a bronze cannon, potsherds, items of ship's hardware, weapons, silver coins, silver bars, jewelry, 36 gold chain *531 lengths, 8 gold bars, 6 gold bar bits, 11 gold coins and a gold disc. c. The Gold Disc, Gold Chain, and Gold Coin
The artifacts at issue here are a gold disc (TSI identification number 554, Florida State identification number L 1406) that weighed 4 pounds, 7.2 ounces (troy) and measured 11 centimeters in diameter (the gold disc), a gold chain (TSI identification number 82 A SR) the gold chain), and a two escudo gold coin (TSI identification number 1479 A) (the gold coin). d. Discovery of the Mother Lode
In late May, June, and July 1985, TSI divers discovered indications of the main body of the ship's treasure cargo (the mother lode). TSI divers located the mother lode on July 20, 1985. The divers found the main body of silver ingots carried in the ship's cargo sitting in stacks on the ocean floor. In the remaining months of 1985, TSI divers recovered 1,041 silver ingots, 115 gold bars, 60 gold coins, 200 copper ingots, over 100,000 silver coins in some 30 chests, 750 pieces of silverware, 350 uncut emeralds, and various items of jewelry, muskets, swords and other ship's tackle and equipment. The mother lode contained around 20 times as much treasure as had been found *532 previously from the Atocha. e. Publicity of the Atocha and the AtochaTreasure
The Atocha is one of the Western Hemisphere's most famous shipwrecks. Atocha artifacts have been displayed in a Key West museum and throughout the country. There were more than 15 major exhibits in cities including Atlanta, Miami, New York, Indianapolis, Baltimore, Washington, D.C., Cape Coral, Florida, and West Coast cities. There was considerable press coverage of the exhibits. There have been more than 50 newspaper articles about the Atocha find. The rediscovery of the Atocha and its treasure was also the subject of three films, two National Geographic documentaries, and a Hollywood movie starring Cliff Robertson. The gold disc donated by petitioner in this case is one of the most widely publicized artifacts from the Atocha. It was included in many exhibitions of artifacts recovered from the Atocha. The King and Queen of Spain hosted an exhibition in the National Geographic Explorers Hall in which it was featured. Photographs of it were published in "The Trouble with Treasure," by E. Lyon, National Geographic Magazine (June 1976) (the gold disc is pictured at pages 786 and 792), and in *533 "Underseas Treasures", National Geographic Society, Special Publications Division (1974) (the gold disc appears on frontispiece). It appeared on the front cover of Florida Keys Magazine (spring 1982). It is also pictured in a book entitled, Treasure of the Atocha, by R. Duncan Mathewson III, petitioner's expert. A smaller gold disc from the Atocha was also found in 1975. It weighed 14.09 ounces, compared to 4 pounds, 7.2 ounces (troy) for the gold disc at issue here. Many more discs were found in 1985 with the mother lode. 2. Division of the AtochaTreasure With the State of Florida and the Point System
When the Atocha wreck was located by TSI in 1971, it was believed that it lay in the territorial waters of the State of Florida. Florida controlled the salvage of shipwrecks in its waters by entering into contracts with salvors. Accordingly, the State and TSI entered into a 1-year salvage contract in April 1971 and additional contracts for each of the three succeeding years. Under these contracts, the State had the right to divide the salvage, giving 75 percent to TSI and retaining 25 percent for the State. A committee was formed in 1974 to establish a system for *534 dividing the recovered artifacts according to the 25-percent-75-percent split (the Division Committee). The committee consisted of 16 persons. Eight represented the State of Florida, four represented TSI, and four were not associated with either TSI or the State of Florida. The Division Committee developed a system (the Point System) under which points were assigned to each artifact recovered. The Division Committee assigned points to each artifact reflecting its judgment as to the relative value of each artifact. The Division Committee did not assign dollar values to the artifacts. The 25-percent share due to the State of Florida under the salvage contracts was determined on the basis of the points assigned to the artifacts. The most valuable objects found before discovery of the mother lode were a brass astrolabe that was still in working condition and a gold chalice (the poison cup). The Division Committee assigned 20,000 points to the astrolabe and 18,000 points to the poison cup. The Division Committee assigned 6,000 points to the gold disc, 741 points to the gold chain, and 200 points to the gold coin. The State of Florida received divisions of treasure recovered from *535 the Atocha wreck in June 1973 and February 1975. The three artifacts at issue here were recovered before the 1975 division of artifacts with the State of Florida. After the 1975 division, the United States Supreme Court, exercising original jurisdiction, decided in United States v. Florida, 420 U.S. 531, 43 L. Ed. 2d 375, 95 S. Ct. 1162 (1975), that the Atocha wreck site was outside of Florida waters. This decision declared the contract between TSI and the State of Florida invalid on the grounds of mutual mistake of fact and failure of consideration. See Florida Dept. of State v. Treasure Salvors, Inc., 621 F.2d 1340, 1349-50 (5th Cir. 1980), affg. 459 F. Supp. 507 (S.D. Fla. 1978). The United States Government also attempted to claim the Atocha under the Antiquities Act, 16 U.S.C. sec. 431 (1976) et seq., and the Abandoned Property Act, 40 U.S.C. sec. 310 (1976) et seq. TSI resisted these claims, and the United States Federal District Court for the Southern District of Florida decided that the United States had no interest in the wreck. Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel, 408 F. Supp. 907 (S.D. Fla. 1976), affd. 569 F.2d 330 (5th Cir. 1978). 3. Petitioner's *536 Ownership and Charitable Contribution of the Gold Disc, Chain, and Coin
Melvin A. Fisher (Fisher) was president of TSI. Petitioner met Fisher through a mutual friend, Melvin Joseph. Petitioner had known Melvin Joseph well for 30 or 35 years. Around 1980 petitioner lent $ 50,000 to TSI. He later received $ 80,000 in lieu of repayment of the loan, apparently derived from treasure given as security for the loan. Petitioner had a good experience with the $ 50,000 loan. He thought it was an exciting investment. In 1982 TSI was severely short of funds. In November 1982 TSI did not have sufficient funds to meet its current obligations, and bank credit was not available to TSI. TSI owed $ 40,000 in back payroll taxes. It had insufficient funds to continue the search for the mother lode. On November 19, 1982, in the transaction at issue here, petitioner lent $ 90,000 to TSI (the loan). The loan was payable in one year, bore no stated interest, and was secured by the gold disc. The disc was featured prominently in a TSI magazine which petitioner saw. TSI representatives told petitioner it was worth 3-1/2 to 4 times the amount of the loan, in excess of $ 300,000, based on a *537 value of $ 54 per point for Atocha artifacts determined by marine archaeologists. Petitioner did not personally inspect the gold disc or have it appraised before making the loan. The loan was evidenced by a promissory note dated November 19, 1982, and signed by Fisher, as president of TSI, on behalf of TSI (the promissory note). Also on November 19, 1982, Fisher delivered to petitioner an option to purchase the gold disc if the promissory note was not paid in full at maturity. The option provided that it was to be exercised in writing. Petitioner took possession of the gold disc as collateral for the loan on or about November 19, 1982. Petitioner also took possession of the gold chain and the gold coin at that time. These two artifacts weren't referred to in written documents accompanying the loan. Petitioner did not obtain insurance for the three artifacts. He stored them in a small safe in a secure vault located in a building with around-the-clock security. TSI did not repay the loan within one year. On November 23, 1983, petitioner exercised his right to purchase the gold disc. On December 9, 1983, Fisher signed and delivered to petitioner a bill of sale transferring *538 to petitioner title to the gold disc, the gold chain, and the gold coin. Petitioner received certificates of authenticity from TSI for the artifacts. On December 28, 1984, petitioner donated the gold disc, the gold chain, and the gold coin to the National Museum of American History in Washington, D.C., which is part of the Smithsonian Institution. 4. Sales of Atocha Artifacts
TSI operated a museum shop in Key West, Florida, in 1984 and 1985 which sold Atocha artifacts and other items. The TSI Museum Shop sold 18 salvaged coins in the first quarter of 1984 for a total of $ 9,600, and 397 coins and other artifacts in 1985 for $ 55,406.50. The average dollars per point for salvaged artifacts sold in the shop was $ 39.02 for the first quarter of 1984 and $ 42.02 for 1985. The highest point value of any salvaged coin or artifact sold at the shop in 1985 was 24 points. About three-fourths of the items sold had a value of one point. An auction was held by Butterfield & Butterfield in Las Vegas, Nevada, on September 26, 1987, which included several items recovered from the Atocha and other sunken Spanish ships which were rated under the point system. The item, sales price, *539 number of points, and dollars per point are as follows: Number
Dollars
Item
Sales Price
of Points
per Point
1.
Eight Escudo
$ 5,500
101
$ 54
Gold Coins
2.
Gold Disc
68,750
1,036
66
3.
Two Escudo
6,600
80
83
Gold Coins
4.
Gold Chain
110,000
1,018
108
5. Report of the Division Committee
The Division Committee met to make point evaluations for items recovered with the mother lode from July 1985 through early 1986, and prepared a report around September 1986. The report stated that $ 54 per point represents the optimum value of Atocha artifacts under special marketing conditions and in no way guarantees value in the market place. 6. Petitioner's 1984 Tax Return
Petitioner timely filed his Federal income tax return for taxable year 1984. Petitioner claimed a charitable contribution deduction for the three artifacts he donated to the National Museum of American History. Petitioner claimed that the fair market value of the gold disc, the gold chain, and the gold coin on the date of donation was as follows: Value Claimed
Points
Gold Disc
$ 324,000
6,000
Gold Chain
40,014
741
Gold Coin
10,800
200
Total
$ 374,814
6,941
*540 Statement 1 to petitioner's 1984 tax return indicated that the values claimed for the three artifacts represent $ 54 per point. The statement described the Division Committee's point system, and stated that in 1978 litigation involving ownership of the Atocha artifacts, a Florida Federal District Court had determined the value of the artifacts to be $ 54 per point for purposes of determining the amount of a Supersedeas Bond required to be posted by the State of Florida. Statement 1 provided in part as follows: In connection with litigation concerning the proper ownership of the above treasure, the Federal Court, in 1977, allowed the release to Treasure Salvors of one-half of the salvage being litigated. For purposes of making this division, the federal government, which at that time was involved in the federal litigation, accepted the point evaluation system devised by the above committee, and it was that system that was used to make the division allowed by the Court. In subsequent litigation, [1] after losing possession of the twenty-five percent which had been held by agents of the State of Florida, the State appealed to the Fifth Circuit. For purposes of evaluating *541 the size of the Supersedeas Bond which had to be posted by the State in order to stay the Mandate of the District Court pending appeal, sales slips, credit card vouchers, etc., all pertaining to items sold up to that point (i.e., 1978) were submitted to the Court. Using the point system from earlier divisions (described above), a dollar value was affixed to each point at that time to determine the amount required for the posting of the Supersedeas Bond. The Federal District Court determined that fifty-four dollars was the value of a point at that time. The pretrial stipulation included a copy of the transcript of the Supersedeas Bond hearing. However, the parties *542 stipulated that the transcript may not be used as evidence of the truth of any matter therein. Consistent with this stipulation, we have based no findings of fact on the hearing transcript. OPINION 1. Fair Market Value of the Artifacts
The first issue for decision is the fair market value of three artifacts donated by petitioner to the National Museum of American History on December 28, 1984. Respondent's determination of the fair market value of the artifacts is presumed to be correct, and petitioner has the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Section 170(a) permits an individual to claim a deduction for charitable contributions made during the taxable year. As relevant here, if the contribution is made in property other than money, the amount of the contribution is the fair market value of the property when the contribution was made. Sec. 1.170A-1(c)(1), Income Tax Regs.
The parties do not dispute that the National Museum of American History was an organization described in section 170(b)(1)(A)(vi) in 1984, or that petitioner's allowable deduction under section 170 in 1984 for a contribution of "capital gain *543 property," as defined in section 170(b)(1)(C)(iv), is limited to 30 percent of his contribution base under section 170(b)(1)(C)(i). The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973). The fair market value standard applied in gift and estate taxes applies here. Anselmo v. Commissioner, 80 T.C. 872, 881 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). The gift and estate tax regulations provide that the fair market value of an item is to be determined in the market where it is "most commonly sold to the public." Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Fair market value of a charitable contribution is a question of fact. McGuire v. Commissioner, 44 T.C. 801, 807 (1965). Opinions of expert witnesses can aid the Court in understanding an area requiring specialized training, knowledge, or judgment. Estate of Rodriquez v. Commissioner, T.C. Memo 1989-13. We are not bound *544 by expert opinions. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). The trial court may adopt some portion and reject other portions of expert testimony. Helvering v. National Grocery Co., 304 U.S. 282, 82 L. Ed. 1346, 58 S. Ct. 932 (1938). The price paid for the property in an arm's-length transaction may be highly probative of fair market value, Tripp v. Commissioner, 337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722 (1985). Respondent cites Lampe v. Commissioner, T.C. Memo 1985-236, where the Court considered the taxpayer's purchase price one year before the date of contribution in deciding the value when contributed. Respondent argues that petitioner's $ 90,000 loan to TSI in the instant case shows the value of the donated artifacts. However, we believe that the loan amount is not a reliable indicator of the value of the property pledged as security because the loan was made when TSI was desperate for funds to continue the search for the Atocha's mother lode. The fair market value of property is not to be determined by a forced sale price. *545 Sec. 20.2031-1(b), Estate Tax Regs. We also believe it is not inconsistent with petitioner's valuation that he did not see the gold disc or have it appraised before making the $ 90,000 loan because he had been assured by TSI that the gold disc was worth much more than $ 90,000, and because his previous $ 50,000 loan to TSI proved successful. It is also understandable that petitioner did not insure the artifacts in light of the fact that they were kept in a secure vault. Both parties relied on reports and testimony of experts to support their respective valuations. Petitioner called Mr. R. Duncan Mathewson III, and respondent called Dr. Frank Sedwick and Mr. John P. Huffman. a. Petitioner's Expert
Petitioner's expert, Mr. Mathewson, has extensive experience in maritime archeology. He directed the archeological recovery of the Atocha as a consultant hired by TSI. As part of that work, he devised a system for locating and identifying the wreck and mapping the artifacts on the sea bed. He also consulted with TSI on the archeological recovery of the Santa Margarita historical shipwreck site, and has directed or participated in several other archeological projects. He was *546 a member of the Division Committee on behalf of TSI. He is a member of several professional associations, including the International Society of Appraisers and the American Numismatic Association. He believed that an appraisal of an artifact recovered from an historic shipwreck should not be primarily based on a multiple of gold bullion value because that underestimates its cultural and historic value. He also considered the price per point for sales of other artifacts rated under the point system and by considering other factors bearing on their value. He also considered the $ 54 per point estimated by the Division Committee, and by the Federal District Court in Miami in 1978. Respondent argues that Mr. Mathewson is not an entirely disinterested and independent appraiser since he has been associated with TSI since 1973 as an archeological consultant, citing Williams v. Commissioner, T.C. Memo 1988-6, where the Court gave no weight to an expert who was not independent. Respondent also cites Holtzman v. Commissioner, T.C. Memo 1980-174, where the Court gave less weight to the testimony of a tenured professor and art museum curator than to coin dealers in deciding the *547 value of numerous ancient Greek coins. Respondent argues it would be consistent with Holtzman to give less weight to the testimony of Mr. Mathewson. We disagree with these criticisms of petitioner's expert. First, Mr. Mathewson's experience in the recovery of the Atocha artifacts and the Division Committee gives him an excellent perspective. Second, Mr. Mathewson is the only expert here that based his analysis on the point system, which we think is helpful in deciding the relative values of these artifacts. b. Respondent's Experts
Respondent's experts were Dr. Sedwick and Mr. Huffman. Dr. Sedwick has a Ph.D, and has served as a professor in Spanish language and literature at several colleges and universities. He is a member of the American Numismatic Association for which he is a coin authenticator, and the American Numismatic Society, and a contributor to their monthly publication, the Numismatist. He has been a collector all his life, and a professional numismatist since around 1981. Dr. Sedwick is one of a few numismatic (i.e., coin) experts and dealers who specializes in coinage of the Spanish empire in the Americas, a large part of which is shipwreck coins *548 and artifacts. He has sold 100 to 150 artifacts from the Atocha and the 1715 fleet, including plates, nails, barrel hoops, keys, coins, chains, and bars, with total sales of $ 10,000 to $ 15,000 over a 9-year span. Dr. Sedwick authored The Practical Book of Cobs, 2d Ed., 1990, and other publications related to Spanish cobs. Cobs are early Spanish or Spanish-American coins. Mr. Huffman is an engineer who has been employed by the Internal Revenue Service as an appraiser since 1981. He was previously employed by the U.S. Department of Energy and the Federal Energy Regulatory Commission. He has been a member of numismatic organizations since the 1970s. He is a member of the American Numismatic Association, the American Numismatic Society, the Middle Atlantic Numismatic Association, and two local numismatic organizations. He also chaired a regional numismatic convention. Mr. Huffman testified that the Atocha was the greatest single Spanish treasure ship lost in U.S. territorial waters, and one of the three richest in the Western Hemisphere. He also testified that, as of 1984, it was the treasure shipwreck most familiar to the average American. Respondent's experts considered *549 numerous factors, such as the bullion value of the gold disc, sales prices of artifacts they believed were comparable, and the condition, workmanship, and historical value of the artifacts. For example, Dr. Sedwick said gold pieces such as the gold disc typically have a value of three times the bullion value of the gold, and Mr. Huffman said two to five times bullion value. Mr. Huffman applied premiums ranging between 15 to 60 percent to reflect historical value. c. The Point System
Respondent's experts did not discuss the Point System in their reports, or give point values for their comparable sales of artifacts recovered from shipwrecks. Dr. Sedwick testified that he had no problem with the point system, or with the concept of establishing a price per point by comparing the sale price of an item with the number of points assigned to it. However, he did not agree with the price per point used by petitioner. We believe the Point System provides a helpful basis for deciding the relative value of Atocha artifacts. Representatives from the State of Florida and TSI negotiated at arm's length to assign point values. Each brought different interests to the negotiations. The *550 point system gives a common denominator for comparing sales prices of artifacts recovered by TSI from the Atocha. d. Numismatic Market versus "Glamour Market"
Neither section 170 nor the Treasury regulations thereunder specifies which market a taxpayer should use in calculating fair market value. Orth v. Commissioner, 813 F.2d 837, 841 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985). Respondent relies on the numismatic market and petitioner relies on auction and museum shop sales of artifacts recovered from sunken shipwrecks where a premium is paid for the excitement and glamour of the artifact. Respondent's expert, Dr. Sedwick, believes there is nothing unique about the Atocha. He views it as one of many shipwrecks. He believed that the comparison should be to numismatic sales rather than to auction or museum shop sales. Dr. Sedwick uses the term "glamour market" in his book, The Practical Book of Cobs 58 (2d Ed. 1990). On cross-examination, Dr. Sedwick read the following excerpt from the book into the record: Gold or silver sea-salvaged cobs usually cost more on or near location than they do in the numismatic market. Go to the South Florida *551 shipwreck areas or to many of the Caribbean islands with a large influx of winter visitors -- the summer tourists, younger and less affluent, spend less -- and you will see the vacationer eager to pay considerably more for a sea-salvaged cob than what it will bring in the numismatic market. Who is to say he is wrong? He is caught up in a mood and wants a memento of his trip. The market is what one is willing to pay when one has money to spend and the opportunity arises. After all, he probably cannot find wreck cobs back in his hometown in North Dakota at any price. And who is to say the tourist shop or "museum," as it is often called, is overcharging? These businesses require expensive locations and entail great overhead. Our vacationer pays for ambience, romance, sea lure, the thrill, perhaps, of being able to gaze out to sea from the shore itself and imagine Spanish galleons out there struggling against hurricanes and pirates. Even the commonest of cobs will inspire romantic appeal if it has been dredged up from hundreds of years on the ocean bottom. Dr. Sedwick also testified that: There is a big difference sometimes -- in fact, frequently -- in numismatic auctions, *552 purely numismatic auctions, and auctions like this, which attracted all the glamour. I attended this auction in person and can assure you that most of the buyers were not knowledgeable buyers. I saw a number of ladies in cocktail dresses and evening dresses. A collector does not go to an auction, a knowledgeable collector, that way. I feel that whoever bought those coins paid far too much.
Mr. Huffman believed the appropriate market for determining fair market value of the artifacts is the numismatic or precious metals market and not the retail museum or gift shop market. He stated that he has yet to meet a knowledgeable buyer in the glamour market. He was also concerned that an auction that was used by petitioner's expert to confirm his value was attended by buyers who were not knowledgeable numismatists. He felt that invitation-only auctions attracted wealthy persons without a lot of knowledge. We recognize that auction and museum shop buyers may decide to purchase based on factors different than numismatists consider, and may not know the things a numismatic knows about a coin or other object. An auction or museum shop buyer may give greater consideration to the romance *553 of a Spanish galleon lost at sea hundreds of years ago. The auction or museum shop buyer pays a price based on certain facts known about the object. That is not a lack of knowledge; it is a different focus. We believe that the value of these Atocha artifacts, especially the gold disc, is enhanced by this romantic appeal and glamour. We believe that sales at the TSI Museum Shop and at auctions capture this element and are appropriately considered in deciding the value of these artifacts. e. Summary of Expert Valuation Testimony
The following table shows the opinion each expert gave at trial for the value of the artifacts at issue here: Summary of Expert Valuation Testimony
Gold Disc
Gold Chain
Gold Coin
Total
Expert Testimony -- Petitioner
Mathewson
*$ 324,000
$ 10-12,000
$ 2,500-3,500
$ 336,500-339,500
Expert Testimony -- Respondent
Huffman
$ 53,800 **$ 5,600
$ 3,200
$ 62,600
Sedwick
34,776
7,000
600
42,376
*554 2. The Gold Disc
The gold disc is one of the most widely publicized artifacts for the Atocha. It has been included in many exhibitions of Atocha artifacts, and pictured in several publications. Petitioner's expert, Mr. Mathewson, believed that the gold disc was truly unique and remained so until the discovery of the mother lode in 1985, and that the publicity it received would help bring the optimum price to a sale of the gold disc. Mr. Mathewson stated that the gold disc can be "confidently appraised on the basis of $ 54 per point as of Deceamber 1984." At trial he said he "would accept" $ 54 per point times 6,000 to estimate the value of the gold disc. Respondent argues that petitioner's expert never states a total fair market value. We disagree; we believe petitioner's testimony is essentially equivalent to a $ 324,000 appraisal. Mr. Mathewson testified that there was great discussion by the Division Committee over whether the $ 54 per point was a valid figure. He also testified that the Miami Federal District Court determination of $ 54 per point was important because it validated what the Division Committee had agreed on. Before filing his report, petitioner's *555 expert, Mr. Mathewson, wrote a series of letters to a lawyer for petitioner giving his opinion that the value of the gold disc was between $ 150,000 and $ 180,000 as of December 1984. At trial Mr. Mathewson stated that he raised the valuation from $ 150,000 to $ 180,000 because he realized that the high-profile items were fetching a higher price tied in reasonably closely with the point system. Mr. Mathewson analyzed sales of artifacts recovered from the Atocha and other wrecks which were sold at an auction sponsored by Butterfield & Butterfield in Las Vegas, Nevada, on September 26, 1987. Those items sold for $ 54 to $ 108 per point. In appropriate circumstances we also consider later sales of comparable property. For example, we consider comparable sales occurring after the valuation date if there are no uncertain probabilities or contingencies which affect the value of the property. Estate of Thompson v. Commissioner, 89 T.C. 619, 629 n.7 (1987), revd. on other grounds 864 F.2d 1128 (4th Cir. 1989); Estate of Stanton v. Commissioner, T.C. Memo 1989-341; Estate of Moss v. Commissioner, T.C. Memo 1982-85. The 1987 Butterfield & Butterfield sales are particularly *556 helpful because the point value is given for the items sold, facilitating a comparison to the artifacts at issue. We note that the mother lode was discovered after the valuation date for these three artifacts and before the auction, but we think this is most likely to have moderated Atocha artifact values because of supply and demand. Respondent's expert, Mr. Huffman, valued the gold disc at $ 53,800. He concluded that it should be treated like Spanish Colonial gold bullion pieces that generally sell between knowledgeable parties in a range of two to five times their bullion value, depending upon their size, shape, and markings. He believed the gold disc to be worth three to four times its bullion value on the valuation date. He then added a notoriety premium of 20 percent. Respondent's expert, Dr. Sedwick, valued the gold disc at $ 34,776. He believed that bullion objects, such as the gold disc, have a value of three times the value of the bullion content. He divided 24 karats by 15-3/4 to arrive at 65.625 percent purity. This was multiplied by 55.2 ounces and by $ 320 per ounce to arrive at $ 11,592. He multiplied this by a factor of three to yield $ 34,776. Dr. Sedwick *557 testified that gold discs are rarely sold at coin shows because very few people can afford to buy them, and that he doesn't know anyone who collects them. This suggests that the numismatic market with which Dr. Sedwick is familiar is not the market where the gold disc would be most commonly sold to the public, and thus not the market to consider in valuing the gold disc. Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. Items rated under the point system sold in the TSI museum shop for $ 39.02 per point for the first quarter of 1984, and $ 42.02 per point for 1985. Items sold there were rated up to 24 points, but about three-quarters were rated at one point. However, we believe the gold disc is worth more per point than those items. It is a distinctive historical and archeological artifact. It was given significant direct publicity through numerous publications and exhibitions. We conclude that Mr. Mathewson's analysis is more realistic overall for the gold disc than that of respondent's experts. Petitioner's expert gave, we believe, fair recognition to the high profile nature of the gold disc. We find that the fair market value of the gold disc on December *558 28, 1984, was $ 300,000. 3. The Gold Chain
The gold chain is a simple chain of flat, oval links. Petitioner claimed a value of $ 40,014 for the gold chain on his 1984 tax return. Petitioner testified that the chain was in one piece when he donated it. On December 28, 1984, Gary Kulik, Chairman of the Department of Social and Cultural History of the National Museum of American History, wrote petitioner to acknowledge receipt of the artifacts. His letter states that "the gold chain necklace will be retained by our Division of Costume," without further detail about its condition. Mr. Huffman testified that he asked the head of the Costume Department whether it was in one or three pieces when donated, and "they pulled their file record listing the ascension of the particular chain, and it indicated at that time that it was in three pieces." The records referred to by Mr. Huffman were not offered into evidence. We give greater credit to petitioner's testimony based on his personal knowledge than to Mr. Huffman's recollection of Smithsonian records. Thus we find that it was in one piece when donated. Petitioner's expert, Mr. Mathewson, estimated that the gold chain had *559 a lower value per point than the gold disc because of the uniqueness of the gold disc and the publicity it received. He valued the gold chain at $ 10,000 to $ 12,000. Respondent's expert, Dr. Sedwick, valued the gold chain at $ 7,000 based on the length, weight, and workmanship of the chain, comparable sales, and personal experience in the numismatic field. He said an Atocha chain auctioned on June 14 to 15, 1988, in New York City, for $ 4,620 was similar to the one at issue. The similar chain was slightly shorter and intact. Respondent's expert, Mr. Huffman, valued the gold chain at $ 5,600. He considered factors such as weight, length, purity, and craftmanship of the chain; availability of other chains; comparable sales; and whether the chain has a certificate of authenticity. Taking into account the entire record here, we find that the fair market value of the gold chain was $ 8,000 on December 28, 1984. 4. The Gold Coin
The gold coin was minted in Seville, Spain, during the reign of Philip III (1598-1621). It was hand-cut, trimmed to proper weight, then struck by a hammer with hand-held dies which lacked a collar. The mintmark, assayer initial, shield and cross *560 are visible. It is undated. It shows wear due to sand abrasion. Petitioner claimed a value of $ 10,800 for the gold coin. As with the gold chain, petitioner's expert, Mr. Mathewson, estimated that the gold coin had a lower value per point than the gold disc because of the uniqueness of the gold disc and the publicity it received. He valued the gold coin at $ 2,500 to $ 3,500. Respondent's expert, Mr. Huffman, valued the gold coin at $ 3,200. He considered factors such as the size, markings, and condition of the coin; the availability and prices of other shipwreck coins; and conversations with numismatic specialists. Respondent's expert, Dr. Sedwick, valued the gold coin at $ 600. He considered factors such as numismatic appeal, condition, the fact that it was minted in Spain, and the fact that it was found in a identifiable shipwreck. We believe the estimates by Mr. Huffman and Mr. Mathewson are more convincing than that of Dr. Sedwick. We think he did not make sufficient adjustments for the premium likely to be paid for this coin. We find that the fair market value of the gold coin was $ 3,000 on December 28, 1984. In light of the foregoing, we hold that the fair market *561 value of the three artifacts was $ 311,000 on December 28, 1984. 5. Negligence
Section 6653(a) imposes an addition to tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 947 (1985). The taxpayer must show that he acted reasonably and prudently and exercised due care. Neely v. Commissioner, supra.
On his tax return, petitioner stated that his deduction at $ 54 per point was based on the fact that in 1978 a Federal District Court in Florida had determined the value of the artifacts to be $ 54 per point. We conclude that petitioner is not subject to additions to tax for negligence for his claimed valuation of the artifacts at issue. 6. Valuation Understatement
Respondent determined that petitioner's underpayment of tax was attributable *562 to a valuation overstatement under section 6659. That section provides for an addition to tax up to 30 percent of the underpayment of tax attributable to a valuation overstatement. Under section 6659(c), a valuation understatement occurs where the claimed value or adjusted basis of property is 150 percent or more of the value or adjusted basis that is "determined to be the correct amount." The addition to tax applies only to an underpayment attributable to a valuation overstatement. See generally Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); Soriano v. Commissioner, 90 T.C. 44, 61 (1988); Zirker v. Commissioner, 87 T.C. 970, 980-981 (1986). The section applies to returns filed after December 31, 1981. Nielsen v. Commissioner, 87 T.C. 779 (1986). We conclude that this addition to tax does not apply to petitioner because the value he claimed for the artifacts ($ 374,814) is less than 150 percent of the value we have decided. 7. Additional Interest for a Substantial Underpayment Related to a Tax-Motivated Transaction
Section 6621(c) (formerly section 6621(d)) provides for an increase in the interest rate where there is a *563 "substantial underpayment" (an underpayment greater than $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." Section 6621(c)(3) defines certain transactions as tax-motivated transactions. The increased rate of interest is effective as to interest accruing after December 31, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and "regardless of the date the return was filed." H. Rept. 98-861 (Conf.)(1984), 1984-3 C.B. (Vol. 2) 1,239; Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Additional interest under section 6621(c) has been upheld in cases involving "blatant misuse of the charitable donation provisions." Snyder v. Commissioner, 86 T.C. 567, 589 (1986); Parker v. Commissioner, 86 T.C. 547, 566 (1986); Johnson v. Commissioner, 85 T.C. 469, 483-484 (1985). Additional interest under section 6621(c) has also been applied to phony charitable contributions deductions. Mulvaney v. Commissioner, T.C. Memo 1988-243. There the transaction was a sham or fraudulent transaction under *564 section 6621(c)(3)(A)(v). Section 6621(c)(3)(A)(i) includes a valuation overstatement as a "tax-motivation transaction." A valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis." Section 6659(c). We have found that there is no valuation overstatement in this case. Consequently, there is no "tax-motivated transaction" and no additional interest under section 6621(c). During the trial petitioner conceded the sales tax issue. To reflect concessions and the foregoing, Decision will be entered under Rule 155. Footnotes
1. See TREASURE SALVORS, INC., a corporation, and ARMADA RESEARCH CORP., a corporation, Plaintiffs, vs. THE UNIDENTIFIED WRECKED AND ABANDONED SAILING VESSEL, * * *, said sailing vessel is believed to be the NUESTRA SENORA de ATOCHA, Defendants, IN THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF FLORIDA NO. 75-1416-Civ-WM↩
*. In his report Mr. Mathewson said the gold disc can be "confidently appraised at $ 54 per point." At trial Mr. Mathewson said he "would accept" $ 54 per point times 6,000 points, i.e., $ 324,000, as a fair market value estimate. ** Mr. Huffman would reduce this by 10 percent if the chain was in three segments when donated.↩