ESTATE OF ANGELINE V. SHARP, DECEASED, FRANCES S. PIGNONE, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sharp v. Commissioner
Docket No. 10241-91
United States Tax Court
T.C. Memo 1994-636; 1994 Tax Ct. Memo LEXIS 655; 68 T.C.M. (CCH) 1521; December 27, 1994, Filed *655 Decision will be entered under Rule 155. For petitioner: John A. Sanders, Allyson F. Creasman, and Keith J. Hesse. For respondent: Francis C. Mucciolo. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Petitioner is the Estate of Angeline V. Sharp (decedent). Respondent determined a deficiency in petitioner's Federal estate tax of $ 1,195,981. The issues for decision are: (1) Whether the value of decedent's interest in a shopping center which she transferred to her children in 1982 is $ 193,000 as determined by respondent, or $ 136,250 as petitioner contends. We hold that the value of decedent's interest is $ 136,250. (2) Whether the value of decedent's interest in a promissory note from American Medicorp Development Co. is $ 81,945 or $ 69,905 as of decedent's date of death. We hold that decedent's interest in the note is $ 81,945. (3) Whether decedent's estate should include the full value of two citrus grove properties, less certain fees and litigation costs, or merely the value of a claim for the recovery of the groves, and further, what the value of such interest was as of her date of death. We hold that it is unnecessary to characterize the nature *656 of decedent's interest and that the fair market value of decedent's interest in the properties, however described, is 75 percent of their full fair market value. Petitioner stipulated that the period of limitations on assessing and collecting estate tax has not expired. All section references are to the Internal Revenue Code as in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. We incorporate by reference the stipulation of facts, supplemental stipulation of facts, and attached exhibits. Decedent was a resident of Orlando, Florida, when she died on May 31, 1987. Acting on petitioner's behalf in connection with this case is decedent's daughter Frances S. Pignone (Frances), who was a resident of Florida at the time she filed the petition. Decedent and her husband, Frank J. Sharp, Jr. (Mr. Sharp), had four children: Frances, John J. Sharp (John), Frank J. Sharp III (Frank), and Rita S. Simpson (Rita). On September 16, 1980, decedent executed a will (the 1980 will), under which her estate was divided equally among her four children. *657 Decedent and Mr. Sharp owned several properties, some jointly and some individually, which they began to transfer to their children in equal shares, beginning in approximately the late 1970s. The children formed various entities, including FJF&R Corporation, Inc. (FJF&R), to manage and operate the properties. By the early 1980s, the children began to disagree about the management and operation of the corporations and the properties. The children aligned into two groups: The daughters, Frances and Rita, on one side, and the sons, John and Frank, on the other. Between 1983 and 1987, at least seven lawsuits were instituted between decedent's daughters and sons to dissolve their various corporations and partition the properties acquired from their parents. Beginning in the early 1980s, decedent began suffering increasingly from memory failure. Decedent's doctor, Robert A. Broome, Jr. (Broome), began treating decedent in 1962 and saw her regularly until her death in 1987. By July 1983, when decedent was 79 years old, Broome suspected that decedent had developed a serious memory defect. Her family was aware that she was extremely forgetful, especially regarding financial matters. *658 Her mental condition continued to deteriorate through 1984 and 1985. In a deposition taken on May 25, 1988, Broome stated he was sure that, as of October 1985 and probably earlier, decedent was incapable of handling her own affairs and understanding a business transaction or document. In addition to her memory deficiency, decedent also experienced dizziness and fainted periodically, beginning in 1981. On several occasions, including June 7, 1985, she fainted and was taken to the emergency room. Fort Gatlin Shopping Center
Prior to 1982, decedent and Mr. Sharp owned a one-half interest in a shopping center in Orange County Florida, known as the Fort Gatlin Shopping Center (the shopping center). The other one-half interest was owned by Billy C. Youngblood (Youngblood), as trustee, and Lee Ann Youngblood Clarke (Clarke), neither of whom was related to any member of the Sharp family. Because of business disputes, Youngblood and Clarke sought to liquidate their interest in the shopping center by sale to FJF&R. The parties entered into a contract for sale and purchase on June 11, 1980, but the closing of the sale was delayed. On September 30, 1981, Youngblood and Clarke *659 entered into a closing agreement for the sale of their one-half interest in the shopping center to FJF&R for a purchase price of $ 272,500. On February 15, 1982, decedent and Mr. Sharp transferred their one-half interest in the shopping center to their four children as tenants in common, each holding an undivided one-eighth interest. In the notice of deficiency, respondent determined that the fair market value of the interest transferred by decedent and Mr. Sharp was $ 386,000 on the date of transfer. Respondent thus determined that decedent made a taxable gift to her children of $ 153,000 (50 percent of $ 386,000, or $ 193,000, less four $ 10,000 annual exclusions), and included that amount as an adjusted taxable gift in calculating petitioner's estate tax. Note from American Medicorp Development Co.
On April 12, 1982, American Medicorp Development Co. (American Medicorp) executed a promissory note, secured by a mortgage, to decedent and Mr. Sharp. The promissory note was for an original principal amount of $ 254,200 and provided for 40 equal quarterly payments of $ 6,355, with interest accruing at 10 percent per year. On Schedule E of the Federal estate tax return, petitioner *660 estimated the value of the promissory note at $ 163,891.51, with decedent's one-half interest in the promissory note valued at $ 81,945.76. After filing the return, petitioner found a copy of an amortization schedule, called "Schedule of Direct Reduction Loan", printed by Financial Publishing Co. for the promissory note. On the amortization schedule, the amount given as the "balance of loan" on the date closest to the date of decedent's death was $ 139,810. In the petition, petitioner stated that, as decedent's one-half interest in the promissory note should be valued at $ 69,905 (one-half of $ 139,810), the value of the promissory note had been overestimated on the estate tax return by $ 12,040.76 ( $ 81,945.76- $ 69,905.00), resulting in an overpayment of estate taxes. Fitch and Osgood Groves
Among the properties decedent owned in 1985 were two orange groves, referred to as the Fitch Grove and the Osgood Grove. On March 6, 1985, decedent executed quitclaim deeds (the March deeds) for the transfer of the two groves to her two daughters. Decedent's lawyer, W. Charles Shuffield (Shuffield), who drew up the March deeds, believed it was important to get the groves appraised *661 prior to delivering the March deeds to the daughters. The March deeds were held in escrow at Shuffield's office and never were recorded. No gift tax return was filed with respect to the March deeds. Sometime after the March deeds were executed, decedent's sons heard about the deeds to the two daughters. Believing that they also were entitled to the groves, the sons had their attorney, Charles E. Davis (Davis), prepare two deeds to the properties. On June 9 or 10, 1985, shortly after decedent's June 7, 1985, hospitalization for dizziness and fainting, Frank and John took the deeds and two witnesses to decedent's home. It is not clear whether Frank and John told decedent that the deeds transferred a one-quarter interest to each son, or whether they told her correctly that the deeds transferred a one-half interest to each. On or around June 10, 1985, decedent executed two warranty deeds (the June deeds) for the transfer of the Fitch and Osgood Groves to her two sons. The June deeds were recorded in Orange County, Florida, on June 10, 1985. No gift tax return was filed with respect to the June deeds. When Frances did not receive a tax bill for the groves in early 1986, she investigated *662 and discovered the existence and recordation of the June deeds. She brought the matter to decedent's and Shuffield's attention. On March 18, 1986, decedent met with Shuffield. Shuffield drafted a demand letter to the sons that decedent signed stating that it had not been decedent's intention to transfer the groves to the sons. The letter states in pertinent part: It has just come to my attention that I apparently signed deeds to you sometime last year transferring the Fitch and Osgood Groves to the two of you. * * * I only realized that this must be the case after not receiving my 1985 real property tax bills for those two groves and, upon having the matter checked, the public records reflect that I signed a deed conveying these groves to you in 1985. * * * Although I apparently did sign deeds for the purported purpose of transferring these groves to you in 1985, it was never my intention to do so and I do not have any recollection of signing deeds in favor of you with respect to the Fitch and Osgood groves. Therefore, since I never had any intention whatsoever to make gifts of these groves to you, I must now respectfully request that you convey my groves back to me at *663 the earliest opportunity that you have, but in no event later than March 28, 1986. * * *
Also on March 18, 1986, Shuffield prepared a new will (the 1986 will) for decedent, which she executed. Under the 1986 will, decedent's estate was divided equally between her two daughters and excluded her two sons. In response to the March 18, 1986, demand letter, Davis advised Shuffield that Frank and John would not reconvey the Fitch and Osgood Groves to their mother. Shuffield then advised decedent that she would have to sue to recover the properties. Decedent consulted with another attorney, Egerton K. van den Berg (van den Berg), regarding the possibility of bringing suit to invalidate the June deeds. After meeting with decedent and Frances, van den Berg expressed his concern that decedent was not mentally competent to bring a suit. Not long after the meeting with van den Berg, Frances instituted guardianship proceedings for decedent. On September 8, 1986, decedent was adjudicated incompetent by reason of primary degenerative dementia. Frances initially was appointed guardian of both the person and the property of decedent. At the instance of Frank, John, and Mr. Sharp, Frances *664 was removed as guardian of the property, and, on November 3, 1986, Sun Bank, N.A. (Sun Bank), was appointed successor guardian of the property of decedent. Frances remained guardian of the person. In its role as guardian of the property, Sun Bank retained Attorney Lawrence E. Dolan (Dolan) to conduct an investigation into the circumstances surrounding the June 10, 1985, conveyance of the Fitch and Osgood Groves from decedent to her sons. As part of this investigation, Dolan had the groves appraised. According to these appraisals, the market value estimates of the groves as of April 28, 1987, were $ 945,000 for the Fitch Grove and $ 2,320,000 for the Osgood Grove, for a total of $ 3,265,000. Decedent died on May 31, 1987. As of the date of death, Sun Bank had not instituted any legal proceedings to set aside the June 10, 1985, deeds, nor had decedent regained possession or control of the Fitch and Osgood Groves. The Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida (the Florida court), admitted to probate the 1986 will of decedent. Pursuant to the terms of the 1986 will, the Florida court appointed Frances and Rita as personal representatives of *665 the estate. On August 25, 1987, Frank and John filed a Petition for Revocation of Probate against the personal representatives of petitioner. Frank and John filed an Amended Petition for Revocation of Probate on September 16, 1987, in which they alleged that the 1986 will was invalid as decedent was mentally incompetent and lacked the testamentary capacity necessary to execute a valid will. Alternatively, they alleged that the 1986 will was procured through fraud, mistake, duress, overreaching, and undue influence by Frances and Rita. On October 28, 1987, Frances and Rita, as personal representatives of petitioner, brought suit against John and Frank in the Florida court for cancellation and rescission of the June 1985 deeds on the grounds of undue influence, fraud, and misrepresentation. The cases were later consolidated for trial, and one final judgment was rendered for both the deed case and the will contest. On January 13, 1988, the Florida court held that the 1986 will was procured by undue influence and at the time decedent had lacked testamentary capacity. The Florida court also held that the June 1985 deeds were procured by undue influence and misrepresentation. The *666 Final Judgment states that the deeds "are hereby set aside and are null and void." The Florida court made no findings concerning decedent's mental capacity at the time of the execution of the June 10, 1985, deeds. Following the entry of the Final Judgment, decedent's prior will, the 1980 will, was admitted to probate. The estate tax return was filed on February 29, 1988, with the Internal Revenue Service Center in Atlanta, Georgia. The Fitch and Osgood Groves were not reported on Schedule A -- Real Estate. On Schedule F of the return, a claim for recovery of real estate and for ancillary damages was reported with a date-of-death value of $ 1,226,522. This value was intended to represent a discount from the April 25, 1987, appraised value of the fee simple interest in the groves to account for the risk of an unsuccessful outcome in the litigation necessary to enforce decedent's claims and for the delays associated with such litigation. Exhibit F-1 of the estate tax return demonstrated how the reported date of death value of $ 1,226,522 was calculated: Date of death values of real
estate:
Fitch Grove
$   945,000
Osgood Grove
2,320,000
Total
$ 3,265,000
Discount for risk of losing
litigation
.50
Undiscounted value of claim
1,632,500
Discount to present value
.751315
Date of death value of claim
$ 1,226,522
*667 Respondent determined that the fair market value of decedent's interest in the Fitch and Osgood Groves was $ 3,265,000 on the date of decedent's death, rather than $ 1,226,522, as reported on the estate tax return. Respondent further determined that the discount of the value of the properties should not exceed $ 98,531, the total amount respondent determined for the attorney's fees and other litigation costs incurred in resolving the dispute. OPINION As an initial matter, we note that respondent argues on brief that the Court erred in granting petitioner's motion to quash the subpoenas respondent served on petitioner's counsel. The Court heard argument from the parties on the motion prior to trial and granted petitioner's motion. We have reviewed petitioner's motion to quash and reaffirm the granting of the motion. Fort Gatlin Shopping Center
On February 15, 1982, decedent and her husband gave their one-half interest in the shopping center to their four children as tenants-in-common. Respondent determined that the fair market value of the interest transferred by decedent and Mr. Sharp was $ 386,000 on the date of transfer, decedent's interest being $ 193,000 (one-half *668 of $ 386,000). Thus, respondent determined that decedent made a gift to her children of $ 153,000 ($ 193,000 less four $ 10,000 annual exclusions), and included that amount as an adjusted taxable gift in calculating decedent's estate tax. As support for this valuation, respondent introduced an appraisal performed on November 21, 1991, by an expert witness who estimated the fair market value of the property to be $ 850,000 on decedent's date of death. Although the determination of value in the notice of deficiency is less than respondent's expert's opinion of value, respondent has not sought an increase in the value originally determined. Petitioner contends that decedent's interest in the shopping center was $ 136,250 on the date of the transfer, because the other one-half interest in the shopping center was sold in an arm's-length transfer less than 5 months earlier for $ 272,500. When property is transferred for less than adequate and full consideration, the amount by which the value of the property exceeds the value of the consideration shall be deemed a gift. Sec. 2512(b). The value of decedent's interest for these purposes is determined by reference to the price at which *669 such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the facts. Sec. 25.2512-1, Gift Tax Regs. On the issue of the fair market value of decedent's interest in the shopping center, as in all other issues in this case, petitioner bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent relies on the report and testimony of Charles David Blackwell (Blackwell) regarding the value of the one-half interest in the shopping center that decedent and her husband presented to their children. At the time of trial, Blackwell had worked as an appraiser for approximately 28 or 29 years. Blackwell used the cost method, the market comparison method, and the income method to arrive at a fair market value of $ 850,000 for the entire shopping center, as of March 1982. Blackwell considered only the value of the entire fee simple interest in the shopping center. He testified that he was unaware of the fact that decedent had owned an undivided one-half interest with Mr. Sharp as tenants by the entireties, and that, *670 in his experience, the value of a one-half interest in property is one-half of the total value. Blackwell also testified that he did not consider the sale of the other one-half interest by Youngblood and Clarke on September 30, 1981, because he was not aware of it. In his report, Blackwell states that the shopping center appeared to be in good condition on the date of his appraisal in 1991. He testified that he assumed the condition of the property would have been the same in 1982, although he was aware that renovations had been done during the intervening years. Petitioner contends that Blackwell's reliance on sales of five other shopping centers is misplaced since Blackwell's report does not state when the comparable shopping centers were built, and he was unable to recall that information at trial. Petitioner also criticizes the report because Blackwell did not examine any leases used at the shopping center, but made assumptions about the applicable lease terms based on lease terms used at the other shopping centers. We believe petitioner's criticisms are valid. Petitioner did not present any expert testimony or an appraisal to support its valuation of the shopping center, *671 choosing instead to rely on the selling price used in the sale of the other one-half of the property by Youngblood and Clarke to FJF&R on September 30, 1981. Respondent contends that we should not rely on the 1981 selling price because the contract of sale was signed on June 11, 1980, and the closing was delayed until September 30, 1981. We do not believe that this is a legitimate criticism since the parties had opportunities to renegotiate the purchase price prior to the closing date and did not do so. We are not bound by the opinion of any expert, and we may accept an expert's opinion or reject testimony that is contrary to our judgment. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Given our concerns regarding Blackwell's appraisal and the evidence available concerning the 1981 sale of the other one-half interest in the shopping center, we perceive no reason to overlook the evidence of the 1981 sale in favor of an appraisal performed 9 years after the valuation date. Although there had been business disputes between the parties, the evidence does not indicate *672 that Youngblood and Clarke were under any "compulsion" to sell. We hold that the value of decedent's interest in the shopping center is $ 136,250. Note from American Medicorp Development Co.
On Schedule E of the estate tax return, petitioner reported that decedent and Mr. Sharp held a promissory note from American Medicorp with an unpaid balance on decedent's date of death of $ 163,891.51, which amount respondent accepted as filed. In the petition, petitioner claimed that an amortization schedule found after the estate tax return had been filed reflected a value of $ 139,810 for the promissory note on the date of death. The fair market value of notes, secured or unsecured, is presumed to be the amount of the unpaid principal, plus interest accrued to the date of death, unless the executor establishes that the value is lower or that the notes are worthless. Sec. 20.2031-4, Estate Tax Regs. While there does not appear to be anything facially wrong with the amortization schedule that petitioner presented at trial, it provides insufficient information about the status of the loan as of decedent's date of death for us to reduce the value of decedent's interest in the promissory *673 note as petitioner requests. The only witness petitioner presented on this issue was decedent's daughter Frances. Her testimony was unclear as to whether she became aware of her mother's interest in the promissory note before or after her mother's death, and whether she knew if payments had been made in a timely manner up to the date of decedent's death. In addition, no evidence was offered as to the amount of any accrued interest at the date of death. Without more, we are unable to find that petitioner has met its burden of proof that the value of decedent's one-half share of the value of the note should be $ 67,905, rather than $ 81,945, as reported on the estate tax return. Fitch and Osgood Orange Groves
The parties have characterized the final issue as a choice between including the full, undiscounted value of the groves in decedent's estate, or including only the value of a "claim" to recover the groves. More specifically, respondent contends that because decedent's transfer of those properties was judicially set aside in 1988, her estate must include the full value of the groves, reduced only by attorney's fees and other litigation costs involved in resolving the *674 title dispute concerning the groves. Petitioner contends that because of the circumstances surrounding decedent's transfer of the groves to her sons in June 1985, decedent would have had to institute legal proceedings in order to recover the deeds. Consequently, at the date of her death, decedent owned only a claim or cause of action for the recovery of the groves from her sons. Thus, petitioner argues, the value of the groves must be discounted substantially for the hazards of litigation and delay. For Federal estate tax purposes, the value of the gross estate is determined by including the value, at the time of death, of all property in which decedent had an interest, real or personal, tangible or intangible. Secs. 2031(a), 2033. Property included in a decedent's gross estate is to be valued at its fair market value on the date of death or the alternate valuation date provided under section 2032. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). *675 Valuation is based on facts reasonably known at the date of valuation, in this instance, the date of decedent's death. This Court has adopted the rule that "subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of valuation." Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987). State law determines whether a decedent has an interest in particular property at the time of death. Morgan v. Commissioner, 309 U.S. 78 (1940); Estate of Gamble v. Commissioner, 69 T.C. 942, 948 (1978). Under Florida law a deed procured by undue influence and misrepresentation is avoidable at the instance of grantor, as opposed to void ab initio. The distinction between these terms is that a void deed does not convey title to real estate, while a "voidable deed is operative to convey the property and creative of contractual obligations unless and until it is set aside by a court." Fla. Jur. 2d, Deeds, Sec. 84 (1992). In McCoy v. Love, 382 So. 2d 647 (Fla. 1979), the Florida Supreme Court clarified *676 several earlier opinions involving deeds obtained through fraud. The court stated: "Where all the essential legal requisites of a deed are present, it conveys legal title. Fraud in the inducement renders such a legally effective deed voidable in equity." Id. at 649 (citing Anders v. Anders, 197 So. 451 (Fla. 1940)). In the instant case, after considering the circumstances surrounding the execution of the June 1985 deeds, the Florida court held that the deeds had been procured through undue influence and misrepresentation and set the deeds aside. Respondent states that if an inter vivos transfer of property of a decedent is invalid, the value of the property must be included in the decedent's gross estate. Respondent then contends that because the inter vivos transfers of the Fitch and Osgood Groves were declared null and void, section 2033 requires that the full value of those real properties be included in the estate, reduced only by attorney's fees and litigation costs. Petitioner has opted to characterize decedent's interest as a claim or a cause of action. The tax due on that interest must be calculated based *677 on its value as of the date of death. Whichever way one chooses to look at the matter, decedent's interest in the groves at the date of her death was worth something less than the full value of the groves. We cannot overlook the fact that there was a cloud on the titles to the properties on that date. Thus, it is highly unlikely that a willing buyer who had full knowledge of all the facts would have paid full price for the groves. The debate over what sort of interest decedent possessed at the date of her death is essentially academic. As Judge Raum commented in his concurring opinion in Porter v. Commissioner, 49 T.C. 207, 227 (1967): I think the question whether the decedent had an "interest" in the property as against a "chose in action" or a "claim" * * * is a false issue. Whether her rights are labeled an interest in property rather than a claim or a chose in action, it was at best an interest that was under a cloud. * * * What goes into decedent's gross estate is the value of her rights at the time of her death, namely, what a willing buyer would have paid for her unestablished interest at that time -- an amount that is without doubt *678 substantially less than the value of that interest computed as though it were uncontested or had already been established.
The question, then, is what was the value of decedent's rights. Respondent presents no expert witnesses on this issue, but contends that the value of the groves, $ 3,265,000, should be reduced only by the attorney's fees and other litigation costs. In the notice of deficiency, respondent increased the deduction for attorney's fees by $ 98,531. Petitioner presented two experts. One of petitioner's experts valued decedent's claim at approximately 50 percent of the full, unreduced value of the groves. The other discounted the value of the groves by 50 percent for the disputed title, and then further discounted the groves for delay and litigation costs. Petitioner's first expert, Dolan, was offered as an expert on the risks of litigation. Dolan is a tax lawyer who represented Sun Bank in its capacity as guardian of the property after decedent was adjudicated incompetent in September 1986. As a tax attorney, Dolan has been involved in litigation relating to disputed property connected with estates and is familiar with trust and estate litigation in State *679 courts in central Florida. He did not recall ever having testified as an expert regarding litigation hazards. One of his principal responsibilities representing Sun Bank was to investigate decedent's transfer of the groves. He interviewed the various parties involved in the deed transactions; specifically, he spoke with the two sons; Davis, the sons' attorney; Shuffield; Frances; and Frances' attorney. He did not interview decedent's doctor. Although Dolan was called as a witness in the consolidated deeds and will cases, he did not review the depositions of the other witnesses or the transcripts of their testimony. He did not review the exhibits in the deeds and will cases. Among the factors he considered in coming to his conclusion were: The existence of the March 1985 deeds to the daughters; the fact that the June 1985 deeds had been drawn up by a well-respected attorney; and decedent's practice of making gifts. Dolan stated that, based on his investigation, he advised Sun Bank that the June 1985 transfers of the groves "appeared to be voidable" and that the guardianship should consider instituting an appropriate legal action to set aside the deeds. In his report, however, *680 Dolan concluded that the success of any litigation to set aside the June 1985 deeds would be no more than 50 percent. Petitioner's second expert, Harry W. Collison, Jr. (Collison), is a professional real estate appraiser. He appraised decedent's interest in the groves as of the date of her death and concluded that the interest was worth $ 1,097,000, based on the following computation: Estimated market value of the fee
simple interest in the Fitch Grove $   931,000 Estimated market value of the fee
simple interest in the Osgood Grove
2,301,000 Total
3,232,000 Discount factor for disputed
title interest
.50 Future value of claim
1,616,000 Discount to present value
.72 Present value of decedent's interest
prior to recognition of litigation fees
1,163,520 Less present cost of litigation to
recover decedent's interest
(67,000)
Net present value of decedent's interest
1,096,520 Rounded to
1,097,000 Collison began by appraising the groves. He then came up with the 50-percent discount for the disputed title by identifying several properties along the Orlando-Vineland Road in the southwest section of Orlando that were involved in title disputes *681 with the city of Orlando. According to Collison's report, the disputes involved the city's plan to expand a road on which all the properties fronted, and a plat note that required the landowners to dedicate property to the city of Orlando on the city's request and for no compensation. In order to enforce the plat note, the city filed declaratory actions. Collison concluded that the transactions involving these properties mirrored the risks associated with decedent's claim at the date of death, and that the combined results of the settlements regarding the properties indicated that a discount of 50 percent would be appropriate in valuing decedent's interest in the groves. Collison then discounted the value of decedent's claim to present value and, finally, subtracted the estimated costs of litigation. The Court often finds expert witnesses' opinions to be helpful in understanding an area requiring specialized training, knowledge, or judgment. However, as the trier of fact, the Court is not bound to accept the experts' opinions. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. at 734. *682 We may adopt some portions and reject other portions of expert testimony as we weigh its persuasiveness and helpfulness. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938). Where both parties' valuations are defective, the Court independently may reach a valuation determination. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Goldstein v. Commissioner, 298 F.2d 562, 567 (9th Cir. 1962), affg. T.C. Memo. 1960-276. Although petitioner's expert witnesses generally considered relevant factors, the discounts applied by the expert witnesses in valuing the likelihood of a successful suit to set aside the deeds were, in our opinion, excessive. We believe that the facts available at the time would support assigning a higher value to decedent's interest in the groves. Collison's report does not address how the facts regarding the execution of the deeds affect the risks of litigation. While we agree that the cases reviewed in his report involved title disputes, we believe they are inapplicable *683 as comparables in the instant case. The title disputes discussed in Collison's report focused on a plat note; none of the actions involved undue influence or misrepresentation. Collison's report offers no evaluation of how the facts surrounding the execution of the deeds to the two sons would have affected litigation regarding the deeds or a potential buyer's determination of whether to purchase. Both experts failed to consider the facts available at the time of death from decedent's doctor, Broome, who had kept careful notes about decedent's mental and physical condition throughout the relevant time periods. We believe that Broome's impressions of decedent's mental and physical condition at or near the time she executed the deeds to her sons would be critical to any evaluation of the chances of successfully challenging the validity of the deeds. While decedent had not been adjudicated incompetent in June 1985, Broome noted that she experienced severe memory failure at that time. Broome's descriptions of decedent, combined with the testimony of others who observed her behavior around the time she executed the deeds, might have raised serious questions concerning her competency. *684 Dolan maintained that decedent's competency to execute the deeds was not a factor that would affect his assessment of the risks of litigation. This conclusion is both illogical and contrary to Florida case law, which generally regards the grantor's competency to be relevant, especially when there are indications that the grantor was subjected to undue influence. E.g., Foster v. Martin, 436 So. 2d 143 (Fla. Dist. Ct. App. 1983); Connell v. Green, 330 So. 2d 473 (Fla. Dist. Ct. App. 1976). In the circumstances presented here, where decedent had no part in drafting the deeds and was not represented by counsel when executing the deeds, and it appears that the sons may have misrepresented the interests being transferred, we believe that an evaluation of decedent's mental faculties would be relevant in weighing likely outcomes of litigation. Although Dolan mentioned several factors that could affect the chances of success, he did not explain adequately how these figured into his calculation of the discount. When asked whether he used a formula to arrive at the discount, Dolan explained that as a general proposition he believed *685 that the rate of success in cases based on undue influence is 50 percent. There are other considerations that we believe petitioner's experts have not weighed appropriately. Notably, neither Dolan nor Collison discussed how evidence of misrepresentation by Frank and John regarding the interest transferred by the deeds would affect a suit regarding the validity of the deeds. In addition, petitioner's experts failed to consider that decedent had signed a letter to her sons, in the presence of her attorney, demanding that they return the groves promptly as she had not intended to sign deeds for them, and she did not have any recollection of signing the deeds. In addition to considering the relevant facts, a hypothetical willing buyer presumably would weigh various legal considerations. We do not believe that petitioner's experts gave sufficient weight to the fact that under Florida common law a presumption of undue influence arises when there is a confidential relationship between the donor and the recipient, and the recipient has actively procured the transfer. In re Estate of Carpenter, 253 So. 2d 697 (Fla. 1971); Lee v. Patton, 342 So. 2d 542 (Fla. Dist. Ct. App. 1977). *686 Both of these circumstances were present in the instant case. When such a presumption arises, the burden shifts to the beneficiary or donee to come forward with a reasonable explanation for his or her active role in the decedent's affairs, and, specifically, in the preparation of the contested instruments. In re Estate of Carpenter, supra at 704. We believe that a buyer would have concluded that it was highly likely that, if the case could not be settled and it was necessary to go to court, the deeds would be set aside. However, the results of litigation are never certain, and respondent's position that there was no chance that the deeds would not be set aside is unrealistic. Based on the record as a whole, we believe that a discount of 25 percent should be applied to the value of the groves to determine the fair market value of decedent's interest as of the date of death. Using the combined fair market value of the groves reported on the estate tax return and accepted by respondent ( $ 3,265,000), we calculate the fair market value of decedent's interest in the groves to be $ 2,448,750. We arrive at the discount of 25 percent without regard to attorney's fees and *687 litigation costs. While these fees and costs would be considered in valuing decedent's interest in the groves, we note that respondent already properly has allowed a deduction for those amounts, pursuant to section 2053, on Schedule J of the estate tax return. See Porter v. Commissioner, 49 T.C. at 223-224. Respondent argues that no discount should be permitted in computing the estate tax, because that would allow a portion of the value of the properties to escape Federal transfer taxes, despite the fact that the full value of the properties was passed on to the next generation. Respondent correctly points out, and petitioner agrees, that, since the June 1985 transfers to the two sons were not valid gifts for Federal gift tax purposes, no gift tax can be imposed. We are troubled that decedent managed to reduce the value of the groves by making an invalid "gift" of the properties to her two sons. However, we believe that these facts are unusual, that any attempt to recreate these facts through collusion would be difficult, and thus, that this is not a serious hole in the transfer tax net. To use this case as a basis for estate planning would be *688 extremely hazardous. To reflect the foregoing, Decision will be entered under Rule 155.